WELKER, Appellant, v. WELKER, Respondent.

*June 5—June 30, 1964.*

For the appellant there were briefs by *Earle L. Christ* and *Brown, Black & Armstrong,* all of Racine, and oral argument by *John E. Armstrong* and *Harley Brown.*

For the respondent there was a brief by *Baumblatt & Goodman* of Racine, and oral argument by *Robert P. Goodman.*

GORDON, J. The trial court denied custody of a three-year-old girl to her mother, even though he expressly found that the mother is fit to have custody, truly loves the child and is "in good health . . . cultured, attractive, competent, intelligent. . . ." He made similar favorable findings with reference to the father. On this appeal we will determine whether it was an abuse of discretion to deny custody to the mother. We have carefully examined the record to determine if there is any sound basis for the trial court's determination.

Mrs. Welker left her husband's home for the purpose of going to college in Eau Claire. She also commenced a divorce action against her husband, and a divorce was

denied to her. We doubt that it is appropriate to regard Mrs. Welker in an adverse light because of these two factors, but even if we were to do so, this would not have a significant effect upon her right to custody of her child. Whether Mrs. Welker should have left her husband's home or whether she had grounds for divorce are not determinative of the question of custody. As is stated in 2 Nelson, Divorce and Annulment (2d ed., 1961 rev.), p. 221, sec. 15.05:

"But the guilt or innocence of the parents with respect to the divorce action is not necessarily controlling on the question of custody of their children, and an award of their custody should be made in accordance with what appears to be for the best interests of the children, even though that involves awarding them to the parent whose misconduct was the cause of the divorce."

A wife who refuses to cohabit with her husband without justification may be denied support for herself. *Schade v. Schade* (1957), 274 Wis. 519, 80 N. W. (2d) 416. It does not follow that her failure as a wife means she is or will be a failure as a mother.

The trial judge observed that Mrs. Welker was heavily in debt for her education and that she had purchased a new Volkswagen automobile; from this he concluded that she lacked financial judgment. Mrs. Welker earns approximately $5,000 a year as a teacher in the public schools of Kenosha. We find it difficult to criticize her for incurring debt for the purpose of obtaining her education. We also doubt that her purchase of a low-cost automobile should bring any opprobrium upon her; even if her automobile purchase was unwise, we cannot ascribe to such act any disqualification as a custodian for her infant daughter.

The trial judge, in commenting upon Mrs. Welker's testimony at the trial, found "over caution" and "reticence." We are reluctant to accede to the trial judge's suggestion

that there is something undesirable in a woman's being reticent. In a volume called "The Cheats," published in 1664, the English playwright, John Wilson, unkindly likened a reticent woman to a modest lawyer—"a paradox in nature." In any event, we have carefully scrutinized Mrs. Welker's testimony, and we are confident that any inadequacy surrounding the nature of her testimony could not have detracted from her competence as a mother.

Mrs. Welker's apartment is not as desirable as the living quarters of her husband. The trial judge also noted that Mrs. Welker would be obliged to leave the child with a baby-sitter during the day, whereas Mr. Welker had made arrangements with his aunt to live in his home and act as a full-time housekeeper. While we appreciate that the husband's apartment and the availability of a housekeeper represent desirable factors in favor of the husband, the record does not demonstrate that the arrangements contemplated for the child by Mrs. Welker are inadequate. The apartment in which Mrs. Welker resides and her arrangements for caretaking are not so unsatisfactory as to become meaningful factors in evaluating the mother's entitlement to custody of her child.

The only other item to be found in this record which must be weighed in connection with the denial of custody to the mother relates to her attitude toward religion. The trial judge stated the following in his decision:

"The court is further of the view that a home in which a firm faith in deity is professed, is considered one of its foundations, is preferable to one in which doubt, skepticism or agnoticism [sic] is professed."

The right to disbelieve and also the right to believe in such nontheistic creeds as Buddhism, Taoism, Ethical Culture, and Secular Humanism have been recognized as being within the protection of the First amendment to the United States constitution. *Torcaso v. Watkins* (1961), 367 U. S.

488, 495, 81 Sup. Ct. 1680, 6 L. Ed. (2d) 982. The right to religious freedom under the United States constitution "requires the state to be a neutral in its relations with groups of religious believers and non-believers." *Abington School Dist. v. Schempp* (1963), 374 U. S. 203, 218, 83 Sup. Ct. 1560, 10 L. Ed. (2d) 844. It follows that courts should not purport to pass upon the comparative merits of various attitudes regarding religion. *Engel v. Vitale* (1962), 370 U. S. 421, 82 Sup. Ct. 1261, 8 L. Ed. (2d) 601.

A related thought was expressed in *Fowler v. Rhode Island* (1953), 345 U. S. 67, 70, 73 Sup. Ct. 526, 97 L. Ed. 828:

". . . it is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment."

When custody of a child is in issue, the court has a narrow scope of inquiry regarding the religious concepts of the parents: Does the prospective custodian hold views which might reasonably be considered dangerous to the child's health or morals? Thus, a court would be warranted in denying custody to a parent whose religious notions would prevent such child's receiving vaccinations or blood transfusions. Cf. *Cude v. State* (Ark. 1964), 377 S. W. (2d) 816; *State v. Perricone* (1962), 37 N. J. 463, 181 Atl. (2d) 751; *New Braunfels v. Waldschmidt* (1918), 109 Tex. 302, 207 S. W. 303.

In a well-reasoned decision, the supreme court of Kansas stated the rule in words with which we concur:

" 'Aside from teachings subversive of morality and decency, and some others equally obnoxious, the courts have no authority over that part of a child's training which consists in religious discipline, and in a dispute relating to custody, religious views afford no ground for depriving a parent of custody who is otherwise qualified.' "

*Jackson v. Jackson* (1957), 181 Kan. 1, 8, 309 Pac. (2d) 705.

In the *Jackson Case,* the trial court denied custody of children to the mother, whose faith was that of a Jehovah's Witness. The husband pointed out that her religious views would require the children to abstain from military service and from saluting the American flag. On review, the Kansas supreme court found an abuse of discretion in the trial court's having allowed the matter of religion to have influenced its decision and therefore set aside the order which had been in favor of the husband.

The record in the instant case shows that Mrs. Welker's ideas as to religion fall far short of being inimical to the welfare of her child. Although nonconformist, her views are clearly not obnoxious or indecent, and it is legally untenable to equate her skepticism with a lack of morals. Under these circumstances, it was improper for the trial court to give any weight in his decision to the matter of religion.

Mrs. Welker's religious views are expressed in the following portion of her testimony:

"*Q.* You don't attend church in Kenosha? *A.* I have.

"*Q.* What church? *A.* Congregational.

"*Q.* Aren't you an agnostic? *A.* Yes.

"*Q.* What is an agnostic? *A.* Someone who does not know what the answers are.

"*Q.* You don't believe in deity do you? *A.* I don't disbelieve.

"*Q.* You don't believe there is a God? *A.* Yes I do.

"*Q.* You do believe there is a God? *A.* Yes.

"*Q.* Yet you call yourself an agnostic? *A.* Maybe we don't have the same definition.

"*Q.* When you took an oath a little while ago you swore to tell the truth so help you God. Did that mean anything to you? *A.* Yes it did.

"*Q.* You said you are an agnostic. *A.* My definition of an agnostic is a person who has doubts and I do have doubts.

"*Q.* Have you ever taken Carol to Church? *A.* Yes. I take her. On the only opportunity I had while she was here I took her to the Congregational Church.

"*Q.* What Congregational Church? *A.* First, I guess, in Kenosha on 60th and 9th.

"*Q.* Never took her to church here in Racine? *A.* I went with her occasionally, yes."

The rule of preference in custody cases in favor of a mother is a strong one. *Acheson v. Acheson* (1940), 235 Wis. 610, 294 N. W. 6; *Jenkins v. Jenkins* (1921), 173 Wis. 592, 181 N. W. 826. In *Peterson v. Peterson* (1961), 13 Wis. (2d) 26, 30, 108 N. W. (2d) 126, the following viewpoint was quoted:

" '. . . nothing can be an adequate substitution for mother love—for that constant ministration required during the period of nurture that only a mother can give because in her alone is duty swallowed up in desire; in her alone is service expressed in terms of love. She alone has the patience and sympathy required to mold and soothe the infant mind in its adjustment to its environment. The difference between fatherhood and motherhood in this respect is fundamental and the law should recognize it unless offset by undesirable traits in the mother. Here we have none so far as mother love is concerned.' "

However, the aforesaid rule of preference in favor of the mother is not a rule of law but rather is one extremely important element to be considered in deciding custody; the polestar remains the welfare of the child. *Greenlee v. Greenlee* (1964), 23 Wis. (2d) 669, 127 N. W. (2d) 737; see *Graichen v. Graichen* (1963), 20 Wis. (2d) 200, 209, 121 N. W. (2d) 737.

Our evaluation of this record convinces us that there was no substantial basis for not awarding custody of three-year-old Carol Welker to her mother. We conclude that the

judgment of the trial court represents an abuse of its discretion. Upon remand a judgment should be entered awarding custody to Mrs. Welker.

*By the Court.*—Judgment reversed, and cause remanded.

HALLOWS, J. (*concurring*). I agree with the result but I do not agree with the criticism of the trial court's statement that a home in which a firm faith in deity is professed is preferable to one in which doubt, skepticism, or agnosticism is professed. The right to believe or disbelieve in the existence of a God, protected by the First amendment of the United States constitution, has nothing to do with the point which was in issue. When the custody of a child is an issue, the court may properly take into consideration the religious or nonreligious background of either or both of the parents. This country was founded upon the concept of the existence of a Divine Creator from whom we have received certain inalienable rights. The denial of the existence of God is not a religion in the ordinary accepted meaning of that word but a denial of the foundation upon which religion rests. Morality, character, and the dignity of human nature depends upon spiritual values and the recognition of a deity. While the court may not prefer one religion or religious faith over another, it might properly decide under what circumstances a child will best receive religious and moral training.