WENDLAND, Respondent, v. WENDLAND, Appellant.

*November 3—November 30, 1965.*

For the appellant there were briefs by *Ray T. McCann,* attorney, and *Leonard L. Loeb* of counsel, both of Milwaukee, and oral argument by *Mr. Loeb.*

For the respondent there was a brief by *Howard & Burns,* attorneys, and *George A. Burns, Jr.,* of counsel, all of Milwaukee, and oral argument by *George A. Burns, Jr.*

WILKIE, J. Two issues are presented on this appeal:

First, did the trial court err in awarding custody of the children to respondent?

Second, is respondent entitled to have appellant contribute toward her attorney's fees where he is granted an uncontested divorce on the ground of adultery?

*Custody.*

In its decision the trial court stated, as to custody:

"I now find that both the father, the defendant Donald H. Wendland and the mother, the plaintiff Audrey K. Wendland, are fit and proper parties to have the custody of the minor children of the parties. It is in the best interest of the children and for their welfare that the custody of said children is granted to the plaintiff wife, subject to the right of visitation on the part of the defendant husband at all reasonable times. Because of the animosity of the parties and because of the plaintiff's past actions, the Court will place this custody and visitation under the supervision of the Department of Domestic Conciliation for a period of one year and review this order on March 4th, 1966 at 2:00 P.M."

Formal findings and a judgment containing provisions to the same effect were entered by the court.

On this appeal the appellant husband contends that the findings that the respondent "is a fit and proper party to have the custody of the minor children" and that such custody "is in the best interests of the children and for their welfare" are against the great weight and clear preponderance of the evidence and constitute an abuse of discretion by the trial court.

As to the scope of this court's review of the determinations by a trial court on matters of custody, in *Belisle v. Belisle* [1] we said very recently:

"Custody matters are highly discretionary and the rule is well established that the trial court's determination will not be upset in the absence of a clear abuse of discretion."

---

[1] (1965), 27 Wis. (2d) 317, 321, 134 N. W. (2d) 491, citing *Bohn v. Bohn* (1962), 16 Wis. (2d) 258, 114 N. W. (2d) 423; *Smith v. Smith* (1957), 1 Wis. (2d) 174, 83 N. W. (2d) 672. Cited with approval in *Whitman v. Whitman* (1965), 28 Wis. (2d) 50, 56, 135 N. W. (2d) 835.

Or as stated in *Bliffert v. Bliffert:* [2]

"The trial court's ruling as to custody will not be disturbed unless it is clearly against the weight of the evidence."

The fundamental reason for giving such wide discretion to the trial court on custody questions has been most recently stated in *Whitman v. Whitman:* [3]

"Especially important is the fact that the trial court is in a better position than this court to determine the best interests of the children, *State ex rel. Hannon v. Eisler* (1955), 270 Wis. 469, 71 N. W. (2d) 376; and to see and observe the parties and the way in which they conduct themselves. *Brown v. Brown* (1960), 9 Wis. (2d) 322, 101 N. W. (2d) 48; *Pollock v. Pollock* . . . [ (1956), 273 Wis. 233, 243, 77 N. W. (2d) 485]; *Greenlee v. Greenlee* (1964), 23 Wis. (2d) 669, 127 N. W. (2d) 737."

Each custody case must turn on its own facts and circumstances. [4] Here, the record reveals the following: Respondent, who will be thirty-seven this December, testified that she was raped while vacationing in Cuba with her sister in 1956. In July of 1963, after the divorce proceedings were started, and while the parties were separated, respondent met a man at a Milwaukee cocktail lounge where she and a girl friend had gone when a concert they had planned to attend was rained out. She gave him her telephone number and they went out to dinner a week later. The man began making daily calls at her home and took respondent and the children boating or swimming on several occasions. Sometime after she

[2] (1961), 14 Wis. (2d) 316, 320, 111 N. W. (2d) 188, citing *Hamachek v. Hamachek* (1955), 270 Wis. 194, 202, 70 N. W. (2d) 595.

[3] *Supra,* footnote 1, at page 56.

[4] *Belisle v. Belisle, supra,* footnote 1; *Graichen v. Graichen* (1963), 20 Wis. (2d) 200, 121 N. W. (2d) 737; *Dodge v. Dodge* (1955), 268 Wis. 441, 67 N. W. (2d) 878.

began seeing this man, respondent was fitted for and purchased a diaphragm. In her testimony respondent explained that she had procured the diaphragm "[b]ecause I was attracted to this man, and I was afraid that, considering my terrible marriage for the last few years, that I might weaken and be indiscrete [sic] with him; and I didn't want to compound my problem by taking the chance of getting pregnant, and so I felt that I needed protection just in case." Respondent refused to answer whether she ever had the opportunity to use the diaphragm. Respondent admits, in her brief, that she had intercourse with this man. A private detective, employed by appellant to keep respondent under surveillance, testified that he observed the respondent and this man having intercourse in the den of her home in September, 1963. At other times during the period of July through September of 1963 she spent weekends with the same man out of town. Respondent stopped seeing him later in September when she learned that he was an ex-convict. At one time in their marriage, respondent indicated to appellant that she doubted the paternity of one of their children.

Appellant also claims that respondent's lack of fitness was demonstrated by the fact that (1) in 1961 she stayed a week in a cabin with another man (although admittedly there were another married couple and ten children— from three families—sharing the cabin for the week); and (2) she met, by chance, with two men at a Milwaukee night club. The record does not support a finding of misconduct on her part in relation to either of these claimed indiscretions.

To complete the factual picture it should be emphasized that there was no evidence that any of the respondent's acts of misconduct had any open adverse effect on the children. Aside from appellant's claim that the children did not receive enough shampoos, no testimony was offered by the appellant or by anyone on his behalf showing that the children were anything but healthy, well-

groomed, mannerly, and well-fed. There was no evidence that the respondent was neglecting or mistreating the children. The husband claimed that the boy had been having some difficulty with his studies at school, that the boy was not working to capacity, and that the boy's troubles in school were due to the fact that he was bothered by the family being broken up by the respondent. The children went to church in the same faith as before the divorce proceedings. After an investigation the department of domestic conciliation recommended that the children remain with the mother. The representative of that department adhered to his position that his recommendation would be the same even if the respondent were guilty of the acts of misconduct heretofore described as established by the evidence.

Thus the trial court was faced with the difficult task of determining whether or not the respondent was a fit person to have the custody of the four small children and whether or not granting her the custody was in the best interests of the children.

This court has said that in matters of custody "the polestar remains the welfare of the child." [5]

The crucial question is whether in every case where a woman has been found guilty of immoral conduct, does this, without any evidence of demonstrable effect of such conduct on the children, mean that she is necessarily "unfit" to have custody of the children and that an award of the custody to her cannot be "in the best interests of the children."

In *Templeton v. Templeton* [6] the mother began living with her next husband before the requisite year had elapsed from the divorce date.[7] The court, while stating that "[n]othing can be said in defense of the conduct of

[5] *Welker v. Welker* (1964), 24 Wis. (2d) 570, 578, 129 N. W. (2d) 134.

[6] (1948), 254 Wis. 92, 35 N. W. (2d) 223.

[7] The conduct in *Templeton* has been interpreted as adulterous; *Bliffert v. Bliffert, supra,* footnote 2.

the plaintiff [wife]" [8] refused to find her unfit in the absence of a showing that "the mother has in any way neglected her child." [9] In *Bliffert v. Bliffert,* [10] the fact that the father had remarried within the year (in violation of secs. 245.03 (2) and 245.04 (1), Stats.) and therefore was illegally cohabiting with his new wife did " 'not necessarily demonstrate depravity of heart or moral unfitness to bring up a child.' " [11] In each of these cases this court upheld a finding by the trial court that the parent, who had committed the immoral act, was nevertheless "fit" and a proper person to have custody of the children.

In *Hamachek v. Hamachek* [12] the trial court originally granted custody of a son to the mother. Subsequently the trial court transferred custody to the father, where the evidence showed that the divorced wife, after the divorce, had an illicit relationship with a married man, giving birth to a child by him. The trial court found that she was "not a fit mother" [13] and, in affirming, this court implicitly rejected the mother's specific contention that she could not be unfit where her "transgression has not affected the welfare of the child." [14]

In *Lewis v. Lewis* [15] it was held, without a discussion of whether the children were in any way influenced, that the mother's infatuation with another man, both before and after divorce proceedings were instituted, was sufficient cause to support the trial court's finding that the mother was unfit and to place the children in the father's custody.

In each of these two cases, the trial court had entered a finding of unfitness on the part of the mother, not-

[8] *Templeton v. Templeton, supra,* footnote 6, at page 93.

[9] Id. at page 94.

[10] *Supra,* footnote 2.

[11] *Bliffert v. Bliffert, supra,* footnote 2, at page 320, quoting from *Jensen v. Jensen* (1919), 168 Wis. 502, 505, 170 N. W. 735.

[12] *Supra,* footnote 2.

[13] *Hamachek v. Hamachek, supra,* footnote 2, at page 197.

[14] Id. at page 198.

[15] (1948), 252 Wis. 576, 32 N. W. (2d) 227.

withstanding that the record contained no evidence of demonstrable effect of the misconduct on the children. The crucial distinction from the case at bar is the fact that the trial court in each instance found the mother "unfit" where as here the trial court found the mother "fit."

In *Vogel v. Vogel*,[16] the wife admitted that she had sexual relations with a man harbored by her in her and her husband's and the children's home during a three-year period, which resulted in her becoming pregnant on two occasions. During the course of the trial, the court stated:

" 'I don't believe that I could, under these circumstances, where she had admitted her adultery or adulterous conduct, let her have custody of these children. . . . I have already indicated that the defendant will not have the custody of the children. . . .' " [17]

Nevertheless, the court awarded custody to the mother. This court reversed, stating:

"As the evidence established conclusively defendant's [the wife's] adulterous conduct and unfitness to have the care and custody of the children, she has by her own wilful misconduct forfeited the right to have their care and custody which she, as their mother, would otherwise have to rear her offspring." [18]

The chief distinction between *Vogel* and the case at bar lies in the fact that in *Vogel* the mother's misconduct was so pronounced that, during the trial, the trial court was stirred to state a position (that the wife would not have custody) that was absolutely contrary to his eventual finding (that she should have custody). Additionally, Mrs. Vogel was found to have harbored this man in the home for three years with children present. Also, her misconduct apparently persisted to a time much more recent in terms of the divorce than in the instant case

[16] (1951), 259 Wis. 373, 48 N. W. (2d) 501.
[17] Id. at page 374.
[18] Id. at page 375.

(where no misconduct was shown after September, 1963, whereas the custody hearing was in January, 1965).

Thus, immoral conduct *per se* does not make a wife "unfit" to have the custody of her children.[19] Where a woman has been a bad wife she nevertheless may be a good mother.[20] Certainly, three square meals a day do not give a license to the mother to lead a personal life that is morally reprehensible. But, the trial court's basic concern here, as in all custody cases, is with what is in the best interests of the children, both physically and morally, and the court is directed to consider the overall well-being of the children. It should not be barred from exercising its discretion to grant custody to the mother where she may have been guilty of gross misconduct at an earlier date, but where the court is convinced that the misconduct has not persisted, that the children have suffered no adverse effects from it, and that the overall well-being of the children will be best suited by leaving the children with the mother (where the normal preference resides assuming that the mother is fit).[21]

In the recent case of *Belisle v. Belisle*,[22] a mother was deprived of the custody of her son because she continued to be emotionally unstable (shown by her continually picking fights in taverns and by her stabbing of her second

[19] See 2 Nelson, Divorce and Annulment (2d ed., 1961 rev.), p. 224, sec. 15.06, where it is stated: "A child should not be taken from a divorced mother even though her conduct on several occasions has not been strictly in accordance with the proprieties as judged by a rigorous code. Nor is it an absolute rule that one who has committed adultery is morally unfit to have the custody of a child. The unusual and peculiar circumstances of a particular case may justify awarding minor children to a parent who has been guilty of adultery, and the guilt of a wife may be overlooked where she is not grossly immoral. The circumstances may show repentance or other facts which render a repetition of the offense improbable."

[20] 17A Am. Jur., Divorce and Separation, p. 16, sec. 820.

[21] *Welker v. Welker, supra,* footnote 5, and cases cited therein; *Bohn v. Bohn, supra,* footnote 1, at pages 261, 262.

[22] *Supra,* footnote 1.

husband) and because there was no showing that the placement of the child with her ex-husband's mother was "working against his welfare." [23]

In a different vein (religious training), in *Welker v. Welker*,[24] a mother who considered herself an agnostic was not deemed unfit to rear her child where "the record . . . shows that . . . [her] ideas as to religion fall far short of being inimical to the welfare of her child." [25]

We conclude that the findings by the trial court that the respondent is a "fit and proper party to have the custody of the minor children" and that such custody "is in the best interests of the children" are not contrary to the great weight and clear preponderance of the evidence and do not constitute an abuse of discretion.

We commend the trial court for the manner in which it proceeded in the consideration of this distasteful controversy. Not only did it call upon the department of domestic conciliation for a complete and impartial investigation of the question of custody, but it specified that the custody and visitation as adjudged is placed under the supervision of that department for a period of one year, with the additional provision that "this order shall and it is hereby ordered to be reviewed on March 4, 1966, . . ." Thus, the trial court is assured of an opportunity to review the whole custody question at that time. We are satisfied that this is the type of case where a review procedure should be built into the trial court's basic award. Though she has been awarded custody, the respondent is not all the way over the "hump" in her efforts to gain custody of the four children. She must still overcome any attack that would lead to a finding that she is then unfit and that keeping the custody with her is not in the best interests of the children.

We recommend to the trial court that it give serious consideration to the appointment of a guardian *ad litem*

[23] *Belisle v. Belisle, supra,* footnote 1, at page 322.
[24] *Supra,* footnote 5.
[25] *Welker v. Welker, supra,* footnote 5, at page 577.

for the four children to represent them in further custody proceedings before the court.

The appointment of a guardian *ad litem* to represent the interests of children who are the subject of a custody fight in a divorce proceeding is a step that the trial court should take only in an extraordinary situation where the trial court believes that what may be in the best interests of the children may not be brought out by the two contesting parties. Although the court, as here, may call upon the department of domestic conciliation for an independent investigation and report, a guardian *ad litem* for the children, as an advocate for their interests, may well be in a position to conduct a further investigation and present evidence to the court that will help it reach its custody determination. Where there have been instances of immoral misconduct on the part of one (or both) parties and where the court is concerned over the effect of such misconduct on minor children, the court, in its capacity as a family court, recognizing that "children involved in a divorce are always disadvantaged parties," [26] may well take additional affirmative steps to protect the welfare of the children.[27] In an uncontested divorce the family court commissioner will make a recommendation on the question of custody.[28] Where there is a hotly contested custody dispute, and the court is satisfied that the procedure of relying on the two parties and the investigation of a welfare agency may not produce all the important evidence that the court should consider in looking after the best interests of the children, a guardian *ad litem* should be appointed. Inevitably this will add to the expense of the divorce proceedings. But such expense will be rewarding if the

[26] *Kritzik v. Kritzik* (1963), 21 Wis. (2d) 442, 448, 124 N. W. (2d) 581.

[27] Appointment of a guardian *ad litem* by the trial court was recommended by this court in *Edwards v. Edwards* (1955), 270 Wis. 48, 70 N. W. (2d) 22, 71 N. W. (2d) 366.

[28] Sec. 247.15, Stats.

interests of the children are better served. This extra consideration is due the children who are not to be buffeted around as mere chattels in a divorce controversy, but rather are to be treated as interested and affected parties whose welfare should be the prime concern of the court in its custody determinations.

If a guardian *ad litem* is appointed by the court, he should be allowed adequate opportunity to make such further investigation as he deems advisable after becoming familiar with the record herein; if he should request the taking of testimony of additional witnesses he should be granted the privilege of calling such witnesses.

There may be some question about the extent to which the trial court, in its scheduled review of the custody order, may receive pertinent evidence on events that precede the trial court's decision of March 4, 1965, in which it found both respondent and appellant "fit." We have suggested that "the doctrine of *res judicata* is not to be applied to custody matters with the same strictness as to others." [29] We also have said that "[i]t is logical that the interest of the child and of the public in the child's welfare should not be concluded by the failure of the parents to bring relevant and important facts to the attention of the court." [30] In *Miller v. Miller* [31] we further said:

"When the question concerns the custody of the children of divorced parents, the trial judge must not be foreclosed from inquiring into matters antedating the preceding judgment. The doctrine of *res judicata* is not a complete barrier in custody matters if circumstances exist which prompt the trial judge, in his discretion, to go behind the previous determination."

If there are facts (bearing substantially on the question of custody) existing but not disclosed to the court at the

[29] *Bliffert v. Bliffert, supra,* footnote 2, at page 323.

[30] *Zillmer v. Zillmer* (1960), 8 Wis. (2d) 657, 663, 100 N. W. (2d) 564, 101 N. W. (2d) 703.

[31] (1962), 15 Wis. (2d) 583, 587, 113 N. W. (2d) 403.

time of its original order, the court, in its discretion, should be free to receive evidence on those facts and to consider the evidence in its review of the custody order. Naturally, at the upcoming hearing the trial court will be primarily concerned with the way in which the present custody order has worked out and with the then existing fitness of the parties to have custody and what custody order is then in the best interests of the children. But in resolving the custody question, the trial court should be free to consider evidence bearing on this question that may reach back before the time of its prior order.

### Attorney's Fees.

Appellant raises the issue of whether he was bound to contribute toward respondent's legal expenses, but fails to discuss the question any further in his brief. Consequently this court is unable to learn his reasons for seeking a reversal of this portion of the judgment. Whether or not the husband must pay a portion of his wife's attorney's fees is a matter within the discretion of the trial court.[32] It is true that respondent offered no defense to the charges of adultery and that appellant won the divorce on this ground, but the custody question, which is intertwined with the divorce proceeding, was bitterly contested. For this reason there was no abuse of discretion in allowing contribution.

*By the Court.*—Judgment affirmed.

---

[32] *Julien v. Julien* (1953), 265 Wis. 85, 60 N. W. (2d) 753; *Hansen v. Hansen* (1951), 259 Wis. 485, 49 N. W. (2d) 434.