DEES, Appellant, v. DEES, Respondent.

*No. 113. Argued January 8, 1969.—Decided February 4, 1969.*
(Also reported in 164 N. W. 2d 282.)

436

438

For the appellant there was a brief by *Godfrey, Godfrey & Neshek,* and oral argument by *Harry F. Worth, Jr.,* all of Elkhorn.

For the respondent there was a brief by *Davies & O'Brien* of Delavan, and oral argument by *John N. O'Brien.*

ROBERT W. HANSEN, J. There is no legal area in which the trial court has more responsibility than in deciding custody matters.[1]

On the limitations inherent in the review of custody placement orders by trial courts, this court has conceded

[1] *Larson v. Larson* (1966), 30 Wis. 2d 291, 302, 140 N. W. 2d 230.

that "The written record does not afford us an opportunity to see and hear the attitudes, demeanors and appearances of the parties and other witnesses" [2] and concluded "The credibility of witnesses and the weight of the testimony [in custody hearings] is best determined by the trial court." [3] As a general proposition, it follows that great weight is to be given to fact findings made by trial courts in child custody hearings.

*Unfit or unable.*

Great stress is placed in appellant's brief on the fact that the trial court did not find the plaintiff "unfit" but only found that she was unable to "adequately care" for the child.[4] The suggestion is that "unfitness" relates only to morals, and that "inability to care for" relates to other disqualifying facts, including mental illness or emotional dysfunctioning. The statement in *Sommers v. Sommers* [5] that the statutory statement "unable to adequately care" refers to circumstances ". . . other than those arising from moral unfitness and which could include the parent's physical, mental, or other conditions or circumstances which would make it difficult or impossible for a morally fit person to give proper care to a child" [6] is not to be read as limiting "unfitness" to be a custodian as applying only to moral misconduct. When the Wisconsin legislature added the phrase "unable to

---

[2] *Id.* at page 300.

[3] *Ibid.*

[4] In its memorandum decision the trial court stated: "The Court does not conclude from these acts and the circumstances surrounding them that plaintiff is a totally immoral person and thereby legally unfit to have custody of her child. The Court is convinced that the aforementioned acts are the result of her mental illness, her emotional instability, and her inability at the time to normally react and adjust to the impact of her divorce and the frustrations that followed. It should not, however, be implied that the Court treats this type of conduct lightly."

[5] *Sommers v. Sommers* (1966), 33 Wis. 2d 22, 146 N. W. 2d 428.

[6] *Id.* at pages 27 and 28.

adequately care" to the statute,[7] it broadened the basis of trial court discretion in the custody placement area, but it did not narrow the concept of "unfitness" as limited to the morality of parental conduct. It provided an alternative basis for denying custody. Actually, there is an understandable reluctance of family courts to pronounce a parent to be "unfit." Particularly, as here, where one deals with a person of fragile mental or emotional strength, such pronouncement can sound like a judgment of doom and adversely affect the recovery of mental or emotional health. In jurisdictions where children are still treated as near-chattels in a comparing of respective rights of parents to custody, this distinction between unfitness and inability to adequately provide care may be very important. In this state, where the primary and controlling consideration is what will be best for the child it is not as crucial because in this state the would-be custodian must establish not only fitness and ability to provide adequate care but also that his or her being awarded custody would be in the best interests of the child. This court has held that a mother can be a fit person to have the custody ". . . but because of other comparative circumstances custody to the father serves the best interest of the child" [8] also suggesting that "A court should not necessarily feel impelled to make a finding of unfitness on the part of the mother when it has determined that the best interests of the child demand its custody be placed in the father." [9] Under the "comparative circumstances" test, we deal not in the coin of censure or blame, but in the concentration of concern on what order will best protect and promote the well-being of the child.

*Medical background.*

It cannot be doubted or denied that the plaintiff has suffered from serious mental and emotional disorders

---

[7] Sec. 247.24, Stats.

[8] *Larson v. Larson, supra,* at page 299.

[9] *Ibid.*

over an extended period of time. In 1960 she began treatment with a psychiatric clinic in Milwaukee. In 1962 she was hospitalized for mental illness. In 1966 she discontinued treatments at the Milwaukee clinic and consulted the Walworth County Counseling Center. Since 1967 she has been under the care of Dr. Walter J. Gleason, clinical psychologist and director of the Walworth Center, undergoing group therapy and consulting with him for an hour every other week. In 1966 her condition was diagnosed by the Milwaukee clinic as "schizophrenic reaction, undifferentiated." In 1962, at the time of her hospitalization, Dr. Gleason stated she was probably in a "psychotic condition." In 1967 Dr. Gleason described her condition as "suffering from an emotional disorder characterized by loss of confidence in self, anxiety and a dependency on her mother." At the time of the hearing, Dr. Gleason testified to her "considerable improvement in anxiety level . . . greater confidence in herself . . . coming to realize the necessity of being independent" but stated she was in need of further counseling.

*Extent of recovery.*

Appellant takes the position that she has recovered sufficiently from mental and emotional disorders to entitle her to the custody of the child of the marriage. As stated by the trial court, this claim asks, ". . . whether the plaintiff since the divorce has mentally, physically and emotionally improved to where she could reasonably be expected to assume adequate parental responsibility toward her son."

The trial court concluded that the plaintiff's condition had not sufficiently improved to the extent that custody could or should be awarded to her. There is ample evidence in the record to sustain this finding.

While the psychologist treating her testified to her considerable improvement in the areas of anxiety, self-confidence and dependency upon her mother, he also

listed areas in which she still needed to improve, including judgment, impulsiveness and sense of dignity. In the light of conduct that can only be described as extremely bizarre, such need for further improvement cannot easily be disregarded. The psychologist concluded his direct examination with this statement:

". . . I'm sure that she will try. I could not say based on what I know that she is not a fit mother. She has her areas of weakness, to be sure, things she'll have to work on, things she'll have to watch out for."

The progress and prognosis appear promising, but full and complete recovery is not clearly established by this testimony and the entire record.

*Welfare of child.*

The issues before the trial court are, however, not to be narrowed and limited to an inquiry as to the degree of recovery from mental and emotional disorders of the custody-seeking parent. This court has said that children are not to be taken from a parent custodian as a penalty for improper conduct.[10] It is equally true that children are not to be given to a custody-seeking parent as a premium or reward for good conduct or recovery from mental or emotional difficulties.

In post-trial hearings as to custody, as well as at the time of trial, the trial court has the responsibility to determine what disposition and what conditions will best serve the interests of the children involved. As this court has stated:

"It is his task to determine what provisions and terms would best guarantee an opportunity for the children involved to grow to mature and responsible citizens, regardless of the desires of the respective parties. This power, vested in the family court, reflects a recognition that children involved in a divorce are always disad-

[10] *Wendland v. Wendland* (1965), 29 Wis. 2d 145, 154, 138 N. W. 2d 185.

vantaged parties and that the law must take affirmative steps to protect their welfare." [11]

In this case, at the time of oral argument, it was stated that the defendant-father had remarried, purchased a home and intended to seek a transfer of custody to him. If he were so to do, it would be incumbent upon him not merely to establish his fitness, but also to prove that the best interests of the boy would be served by the transfer or change of custody. If the plaintiff-mother were to establish full and complete recovery from the disorders that have plagued her, that fact alone would not require nor justify, ipso facto, the transfer of custody to her. It would still be her responsibility to also establish that the future well-being of the child would be furthered by the change of custody. This court has said "the polestar remains the welfare of the child." [12] That means just that.

*Rights of child.*

One of the affirmative steps that can be taken by trial courts in custody matters is the appointment of a guardian *ad litem* to represent the interests of the child or children who are subjects, not objects, of the court inquiry. In the *Wendland Case* [13] this court stated that a guardian *ad litem* should be appointed in contested custody disputes where ". . . relying on the two parties and the investigation of a welfare agency may not produce all the important evidence that the court should consider in looking after the best interests of the children . . . ." [14]

More recently, in *Koslowsky v. Koslowsky* [15] the suggestion was repeated and expanded, this court stating,

[11] *Kritzik v. Kritzik* (1963), 21 Wis. 2d 442, 124 N. W. 2d 581.
[12] *Welker v. Welker* (1964), 24 Wis. 2d 570, 578, 129 N. W. 2d 134.
[13] *Supra,* footnote 10.
[14] *Id.* at page 156.
[15] Ante, p. 275, 163 N. W. 2d 632.

". . . we recommend the practice of appointing a guardian *ad litem* to represent the interests of the children in those instances where the evidence is either nonexistent or inadequate to determine the comparative fitness of the parents and where the best interests of the child are. We also again commend the practice in contested hearings where it is apparent that the dispute is centered on the desire of the parents rather than the best interests of the child." [16]

By any or all of these tests this is clearly a case in which the trial court should have appointed an attorney to serve as guardian *ad litem* for the child, Scott. The appointment of the guardian would have in this situation aided the trial court in fully considering whether the welfare of the child might not be best served by his remaining in the foster home with the minister and his wife where he has spent two formative years. A growing child is not a ping-pong ball to be lightly batted back and forth from one home to another. The foster parents are not parties to this action, but the child is, and all available alternatives must be evaluated in reaching the determination as to what order will best serve the child's present and future well-being. If the appointment of such legal representative for the interests of the child were to help make clear to the plaintiff and defendant that the controlling consideration is the welfare of their child, not their wishes or desires, that would be an added plus. Since this case must be reversed and remanded for a new hearing, it will be returned with direction that a guardian *ad litem* be appointed to represent and speak for the best interests of the child, Scott, in the new hearing, the costs involved to be charged to the parents on an equitable division.

*Social Service Report.*

The order of the trial court will be reversed and the matter returned for a new hearing on the objection raised

---

[16] *Id.* at page 283.

by appellant to the court's consideration without notice to the parties of a report from the Walworth County Department of Social Services and access to the report will be given to the parties if they so desire. It is clear that the trial court had before it a report from the department concerning at least the matter of parental visits to the child at the home of the foster parents. (In its memorandum decision, the trial court states: "From the record before the Court and from the report of the Department of Social Services, the Court is very concerned and disturbed over the attitude and the conduct of plaintiff's mother in her relationship with Scott.") It is conceded that the content, even the existence of such report, was not made known to counsel for the plaintiff or counsel for defendant. This is clearly error.

Wisconsin was among the first of the states in the union to permit reports of social agencies to be considered by family courts and made part of the record in divorce and custody hearings. In part, this was a recognition that a qualified family conciliator or child guidance worker was to be considered an expert in the field of family relations, much as is the psychiatrist in mental health hearings or the appraiser in real estate cases. In part, this was an implementing of the spirit and purpose of the Wisconsin Family Code and a recognition that, in this state, "The trial court may, on his own initiative, gather information on the question of whether a proposed change enhances the welfare of the children. This information may be in addition to the evidence produced by either party as to whether the proposed modification will serve the best interests of the children." [17]

However, such report from a social service or court agency cannot be a clandestine document, kept from the parties and made available only to the judge. In the *Wendland Case*,[18] this court commended the trial judge

[17] *Kritzik v. Kritzik, supra,* at page 449.
[18] *Supra,* footnote 10.

for calling upon its department of domestic conciliation for a complete and impartial investigation of the question of custody,[19] and stated ". . . the court, in its discretion, should be free to receive evidence . . . in its review of the custody order."[20] However, the restrictions and the manner in which such reports of social service agencies are to be received as evidence in family courts were clearly stated in *Larson v. Larson,*[21] this court then stating:

"The use of reports by qualified child welfare personnel is commended. . . .
"If the reports are considered by the trial court, it should appear in the record that each party had an opportunity to examine the report and challenge its content and the scope and nature of the investigation leading to the report. Preferably the investigating welfare agent should be subject to examination and cross-examination. Further, the report should be made a part of the record, sealed if deemed advisable in the discretion of the court, so that in the event of an appeal the facts upon which the trial judge exercised his discretion in determining custody will be available for review."[22]

The parties or their counsel are entitled to know of the existence of the report and what it contains. Either of the parties may desire to subpoena the worker who conducted the investigation for interrogation as to the nature and extent of the investigation. Either party may desire to call as witnesses other persons who will testify as to matters contained in the report. At the very least, the parties or counsel are entitled to know about all reports and memoranda that will be considered by the judge in reaching his determination. Even in this most delicate and sensitive area, secrecy is abhorrent and secret or undisclosed reports are not to be considered or relied upon by the trial court.

---

[19] *Id.* at page 155.
[20] *Id.* at page 158.
[21] *Supra,* footnote 1.
[22] *Id.* at page 302.

It may well be that there was little or nothing in the report of the social service worker to which the parties would object. However, one of the troubles with cloaks of secrecy is that of this no one can be sure until he sees the report. The taint may be slight, but taint there is, and it requires setting aside the order of the court and directing that a new hearing be conducted.

*Attorney fees.*

Complaint is made that the trial court did not order the defendant to pay, or at least contribute to payment of the ex-wife's attorney fees. On the issue of whether an ex-husband is to pay for the lawyer for the ex-wife, this court has said that this ". . . is a matter within the discretion of the trial court." [23] Certainly, there is here no abuse of discretion in the refusal to order such contribution by the former husband to the former wife's counsel fees. This practice of compelling the husband to contribute to the wife's counsel fees developed in the era when few women were employed or otherwise able to retain counsel to represent them in family law cases. Unless the husband was ordered to pay at least part of their legal expenses, they were effectively denied the assistance of counsel. Even in such era and under such circumstances, the twin prerequisites for such court order for contribution were the need of the wife and the ability to pay of the husband. The trial court possessed and still possesses wide discretion in applying such tests.

Here the record appears to establish no showing of need on the part of the wife nor ability to pay on the part of the husband. So the foundation for exercise of the court's discretion has not been laid. Where the interlocutory period has expired and the status of husband and wife has legally and literally ended, it would appear that a strong showing indeed must be made to justify requiring

---

[23] *Wendland v. Wendland, supra,* footnote 10, at page 158.

the former husband to pay two attorneys, his own and his ex-wife's.

*By the Court.*—Order reversed with directions that a new hearing be held and that a guardian *ad litem* for the child, Scott, be appointed, the fees of said guardian *ad litem* to be paid by the parties to this action in such percentage and on such terms as the court may prescribe.