In Re the Custody and Support of Neven D.H.:

David E. Helling, Petitioner-Respondent,

v.

Billie Jo Lambert, Respondent-Appellant.

Court of Appeals

*No. 03–1097. Submitted on briefs December 5, 2003.—Decided April 1, 2004.*

2004 WI App 93

(Also reported in 681 N.W.2d 552.)

DEININGER, P.J., dissents.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Lynn J. Bodi* and *Carol M. Gapen* of *The Law Center for Children & Families*, Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Tod O. Daniel*, Janesville.

For Neven D.H. the cause was submitted on the brief of *Michael A. Haakenson* of *Haakenson & Haakenson*, guardian ad litem for Neven D.H., Janesville.

Before Deininger, P.J., Dykman and Higginbotham, JJ.

¶ 1. DYKMAN, J. Billie Jo Lambert appeals from a judgment awarding primary physical placement of her son, Neven, to the boy's father, David Helling. She claims the trial court erroneously considered her non-marital relationship with a third party as a negative factor absent any showing that the relationship was harmful to the child; that the court was biased against her based on her living arrangements and pregnancy; that the court failed to give adequate consideration to the harm which could result from removing the child from his primary attachment; and that there was insufficient evidence to support the court's conclusion that placement with the father would be in the child's best interest. We conclude that the trial court's opinion of the stability of nonmarital relationships in general, which it stated was based in part upon its view of other paternity cases it had seen, was insufficient to support a factual finding that the mother's specific living situation in this case was unstable. Because the trial court

identified its finding that the mother's living situation was unstable as one of the "main factors" supporting its decision, we reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 2. Neven was born on March 1, 2000. Lambert and Helling were living together at that time, and Helling formally acknowledged his paternity of Neven after the child's birth.

¶ 3. Helling and Lambert's relationship deteriorated. Helling moved out of the parties' shared residence in October of 2000. The parties agreed between themselves that Helling would have Neven overnight on Tuesdays, Thursdays and Saturdays each week. That arrangement continued until August of 2001, when Lambert moved in with her new boyfriend, Scott Weber, whom she had been dating for over a year.

¶ 4. In August of 2001, Helling filed a family court action seeking primary physical placement of Neven. The trial court entered a temporary order placing Neven with Helling on Tuesday and Thursday evenings and alternate weekends.

¶ 5. By the time of the hearing, Lambert had been dating Weber for about two years, living with him for three months, and was expecting a child with him. Weber testified that Lambert was not officially on his lease, but was paying him $425 per month in rent, and they were splitting other expenses. Lambert testified that she and Weber had no current marriage plans, but that she hoped to build a permanent long-term relationship with him. While at work, Lambert placed Neven in daycare with a woman caring for four other children about Neven's age. Helling's sister provided daycare for Neven during Helling's periods of placements.

¶ 6. Consistent with the guardian ad litem's recommendation, the trial court decided to award Helling primary physical placement, primarily citing the instability of Lambert's living situation. The details of the trial court's reasoning will be discussed more fully below.

## DISCUSSION

¶ 7. We review the trial court's placement decision under the erroneous exercise of discretion standard. *Wiederholt v. Fischer*, 169 Wis. 2d 524, 530, 485 N.W.2d 442 (Ct. App. 1992). To be sustained, a discretionary determination must be based upon the facts appearing in the record and in reliance on the appropriate and applicable law. *Luciani v. Montemurro-Luciani*, 199 Wis. 2d 280, 294, 544 N.W.2d 561 (1996). Thus, although a court has broad discretion in making placement decisions, its power is still limited to that provided by statute. *Schwantes v. Schwantes*, 121 Wis. 2d 607, 360 N.W.2d 69 (Ct. App. 1984).

¶ 8. Under WIS. STAT. § 767.24(4)(a)2 (2001–02),[1] the trial court "shall set a placement schedule that allows the child to have regularly occurring, meaningful periods of physical placement with each parent and that maximizes the amount of time the child may spend with each parent, taking into account geographic separation and accommodations for different households." The court must consider a variety of factors relevant to the best interest of the child in making its determination, including the wishes of the child and parents; the

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

interaction of the child with his parents or other persons who may significantly affect his or her best interests; the amount of time the child has spent with each parent; the child's developmental needs and adjustment; any physical or mental health issues; any abuse issues; the availability of child care; the ability of each parent to cooperate and facilitate the other parent's contact with the child; and any professional assessments. § 767.24(5). In addition, the court shall consider "the need for regularly occurring and meaningful periods of physical placement to provide predictability and stability for the child," and "[s]uch other factors as the court may in each individual case determine to be relevant." § 767.24(5)(em), (k). However, because freedom of association is constitutionally protected, a court may not base a placement decision on a parent's nonmarital sexual conduct or relationship with a third party absent specific evidence that the conduct or relationship in question has had or would have a significant adverse impact on the child. *See Schwantes v. Schwantes*, 121 Wis. 2d at 625–26.[2]

¶ 9. Here, the trial court found that both parents had spent substantial amounts of time with the child and interacted well with him; that the child was well adjusted; that there were no mental health or abuse issues; and that the parents were able to communicate reasonably well with one another. While "not denigrating" the mother's daycare services, the trial court fa-

---

[2] Helling contends that *Schwantes* is inapplicable here because that case involved the modification of an initial placement. However, because the modification in that case was based upon the violation of a condition set forth in the initial placement decision, the court did in fact analyze the topic of third-party relationships in the context of initial placement decisions.

vored the father on that factor due to the strong relationship the father's sister had with the child. The trial court acknowledged that the mother had been the primary caregiver, but explained that it was giving that factor less weight than it might have in other cases because the child had demonstrated an ability to adjust well to the changes he had already experienced. We see no misuse of discretion in the trial court's consideration of any of these factors.

¶ 10. The trial court then focused on the factor enumerated in WIS. STAT. § 767.24(5)(em), the "need for regularly occurring and meaningful periods of physical placement to provide predictability and stability for the child." Lambert argues that the trial court erred in interpreting this provision as a general requirement for predictability and stability in the child's life, rather than a preference for regularly occurring periods of physical placement. Even if we were to read that factor as Lambert urges, however, we are persuaded that predictability and stability would still be permissible factors for a court to consider as relevant to the child's best interest under the catchall provision in § 767.24(5)(k).

¶ 11. The main problem with the trial court's analysis, in our view, is not its consideration of stability as a proper factor, but rather its factual basis for finding that Lambert was "not in a predictable and stable situation." The trial court specifically found that Lambert's situation was not stable "because . . . [she had] recently established a relationship with Mr. Weber." It went on to state:

> That relationship, if I calculate it correctly, has existed where you live together for at the most three months, and it's the kind of relationship that can be here today and gone tomorrow because when people do

not get married, that relationship does not have the stability of law. It can end tomorrow. That concerns me.

It also concerns me, and, you know, I observed Mr. Weber up here. I observed Ms. Helling. I didn't hear any testimony about how that child gets along with Mr. Weber. Here we have got somebody that's in that child's life and is going to be in that child's life on a fairly consistent basis, and I'm concerned about that.

And I'm concerned by the new relationship. You don't own the home, that you are there at Mr. Weber's largess, and that is one of the most important things I think in this case.

And I also agree with Mr. Daniel, I think it shows poor judgment on your part that you entered into that relationship, that you will have another child out of that relationship with no predictability or stability in it.

And I guess in part my attitude about this type of thing is based on the fact that I have probably 40 to 50 paternity cases a month which are brand new, and I don't think that's right. And I don't think those are predictable or stable relationships, and I guess one of the criterion that I based that decision on, I see it 40 to 50 to 60 times a month. I see what happens. That concerns me.

(Paragraph divisions revised.) We see several flaws in the trial court's reasoning.

¶ 12. First, although it is true that Lambert and Weber had only been living together for three months by the time of the hearing, it was undisputed that they had been dating for two years. We therefore question the characterization of their relationship as having been "recently established."

¶ 13. Second, the trial court's assertion that Lambert and Weber's relationship is the kind that "can be here today and gone tomorrow" appears to have been based solely on the fact that the relationship was nonmarital in nature. The trial court's generalized assumption about the stability of nonmarital relationships ignores the reality that marital relationships can also end in divorce. Moreover, it violates the maxim that "[e]ach custody case must turn on its own facts and circumstances." *Wendland v. Wendland*, 29 Wis. 2d 145, 149, 138 N.W.2d 185 (1965). Lambert testified that she hoped to have a "permanent, long-term relationship" with Weber. We see nothing in the record which would undermine Lambert's testimony or indicate that Lambert and Weber's relationship was in any particular jeopardy. Indeed, the trial court's own comment that Weber was "going to be in that child's life on a fairly consistent basis" suggests a likelihood that Lambert and Weber's relationship would continue.

¶ 14. The trial court could reasonably take into consideration the nature of Weber's relationship with the child. However, Weber had been dating Lambert for two of the two-and-a-half years of the child's life, and the trial court found that the child was well adjusted. Absent any specific evidence of problems, we see no factual basis for the trial court to draw any unfavorable inferences about Weber's relationship with the child.

¶ 15. The trial court could also reasonably consider the stability of each parent's living situation. Again, however, there was nothing in the record to suggest that Lambert and Weber would not be living together for an indefinite time into the future, or that Lambert was any more likely to move again sooner than Helling, who had himself moved twice after Neven's birth. Nor could the trial court reasonably infer that

Lambert's past relationship history made her more likely than Helling to fail in future relationships, when the only failed relationship in evidence was that of both Lambert and Helling. While the fact that Lambert was not formally listed on Weber's lease might legally allow Weber to ask Lambert to leave at any time, there was absolutely nothing in the record to suggest any reason why he would be likely to do so.

¶ 16. We next consider the trial court's comments that Lambert's entering into a relationship with Weber, and having a child with him, showed "poor judgment," and that the court did not think it was "right" that so many paternity cases were being filed. It again appears that the trial court was relying in part upon evidence outside of the record, since the "40 to 50 to 60" monthly paternity cases upon which the trial court claimed to rely for its finding that "those" relationships (which we understand to mean between unmarried parents) were not predictable or stable were not before the court in this case.

¶ 17. In sum, we are persuaded that the trial court's finding that Lambert's living situation was "unstable" was based primarily not upon evidence in the record, but rather upon the trial court's negative view of her unmarried status. We further agree with Lambert that the trial court's comments reflect an impermissible consideration of her nonmarital relationship with a third party as a negative factor absent any showing that the relationship was harmful to the child, in violation of her associational rights. *Schwantes*, 121 Wis. 2d at 625.

¶ 18. The dissent correctly notes that, unlike in *Schwantes*, the trial court here did not explicitly condition the mother's opportunity for continued physical placement upon the termination of her third-party

relationship. We see little practical distinction, however, between an order which forces a parent to choose between a third-party relationship or continued periods of physical placement and one which denies equal or primary physical placement based upon an existing third-party relationship. In each instance, the parent's choice to associate with a third-party ultimately affects the amount of time the parent will have with his or her child. Accordingly, we believe that showing a significant adverse affect upon the child is a necessary prerequisite to adverse consideration of a third-party relationship. This is required to protect the same associational rights identified in *Schwantes*.

¶ 19. The dissent also correctly notes that the trial court's view of Lambert's living situation was not the only factor in its decision. If the trial court's comments in this regard had merely been made in passing, we would agree that the rest of the trial court's discussion would provide a reasonable basis for its decision. But the trial court itself noted that many of the other factors it considered "really don't cut either way." Lambert's living situation was one of the few main factors the court focused on in making its decision. It is impossible to know what conclusion the trial court would have reached had it not relied heavily on Lambert's living situation to reach that conclusion. Because the trial court lacked a sufficient factual basis for a finding upon which it relied heavily in making its placement decision, we conclude that it erroneously exercised its discretion.

¶ 20. We emphasize that we are not holding that a trial court cannot consider whether a parent's particular lifestyle choices have an impact on the best interests of a specific child. Findings regarding instability in living conditions must, however, be based upon evi-

dence specific to the individual case, not generalizations. There was insufficient evidence here from which the trial court could have made a finding that Lambert's relationship was so unstable as to adversely impact the child. We therefore remand to have the trial court reconsider the placement decision in this case without treating Lambert's relationship with Weber as a negative factor.

*By the Court.*—Judgment reversed and cause remanded with directions.

¶ 21. DEININGER, P.J. (*dissenting*). The majority concludes that the trial court impermissibly considered Lambert's "nonmarital relationship with a third party as a negative factor absent any showing that the relationship was harmful to the child." Majority at ¶ 17. Because I conclude that the trial court did not base its placement decision on the fact of Lambert's "nonmarital relationship with a third party," but on the relative predictability and stability of the parents' present living arrangements, as well as on several other permissible factors, I respectfully dissent. In my view, the trial court applied the correct law to the relevant facts and reasoned its way to a reasonable conclusion, one that a reasonable judge could reach on the present record. *See Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). There is thus no cause for this court to disturb the trial court's discretionary decision and I would affirm it.

¶ 22. The majority takes the trial court to task for making what it deems unsubstantiated and impermissible inferences regarding Lambert's relationship with Mr. Weber. It does so after excerpting and isolating only a small part of the trial court's bench decision. In order to determine whether the court erroneously exercised

its discretion, however, we must consider the remarks quoted at paragraph 11 of the majority opinion within the context of the parties' arguments and the court's entire ruling.

¶ 23. The child's guardian ad litem recommended that Helling have primary placement. In his written report to the court, the guardian ad litem commented on each of the factors set forth in WIS. STAT. § 767.24(5) (2001–02).[1] He explained that his recommendation was based on concerns that Lambert "may not be fostering a significant relationship with Neven and his father" and that she "has a history of some emotional/mental difficulties." The guardian ad litem had "almost no concerns" regarding Helling and his ability to care for his son. He renewed his recommendation in favor of Helling at the conclusion of the custody hearing, citing in addition a concern over Lambert's "present living situation" where she had no "enforceable right" to remain in her boyfriend's residence "if something went bad" in the relationship.

¶ 24. Helling's counsel agreed with the guardian ad litem's report and analysis, and he emphasized the stability of his client's "home situation" and Helling's proximity to extended family who had strong bonds with the child and assisted with child care. Counsel contrasted that to Lambert's circumstances:

> Now she finds herself with all due respect in another situation like she was earlier . . . . She has another child on the way now. She is in the same spot, and it's not very long down the road where they will have to work out problems they created for that child. I think that shows a lack of maturity and stability on

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

> her part, you know. They are living in a situation she
> has no ownership. I mean, she is basically a tenant, you
> know, at will of a "boyfriend" . . . . I think it shows a lack
> of maturity, lack of judgment and lack of forethought.

Lambert's counsel emphasized the advantages of the placement plan Lambert favored, asserted that she had been the child's primary caregiver, and responded to the "living situation" issue by noting that Lambert had maintained stable, long-term employment and thus had "income appropriate to make adjustments in case there were other things that might change."

¶ 25. Given the guardian ad litem's recommendation and counsel's arguments, it is not surprising that the trial court commented in its ruling on Lambert's present living situation. The majority agrees that the trial court could "reasonably consider the stability of each parent's living situation." Majority at ¶ 15. That is precisely what the court did in the excerpt quoted at paragraph 11 of the majority opinion.

¶ 26. The court deemed Lambert's living situation to be less predictable and stable than Helling's, but that was not the court's only consideration in awarding Helling primary placement. The court began its ruling by noting that it was making an initial placement decision, not considering whether to modify an existing placement arrangement. It then made routine findings of fact regarding the parties and the child, followed by an extensive discussion of the placement issue:

> Under all of the testimony of the parties both
> parties are fit and proper persons to have the care,
> custody and control of the minor child of the parties.
> Both parties are good people. Both parties are good
> parents. The child is doing well. The child is in good
> health mentally and physically. The child is well ad-
> justed at present to his situation and both homes. The

child interacts well with both parents. Both parents have spent quality time with the child in the past. Both parents are capable of providing the child's needs and caring for the child on a daily basis.

So I'm asked to make a judgment about which would be the best parenting situation for the child. Now in doing that, first of all, I have a guardian ad litem appointed. He is appointed by the Court. The guardian ad litem makes a recommendation to the Court. The guardian ad litem represents the child . . . in the child's interests and doesn't represent either parent's interests.

We have independent contract guardian ad litems in our county. The reason is we hope they develop some expertise, and also they're beholden to no one. They are beholden only to the Court. I expect when I appoint a guardian ad litem from contract guardian ad litems, that I will get a conscientious, diligent and fair, unbiased opinion about what the guardian ad litem thinks is in the best interests of the child. And when I do so, I think it's incumbent on the Court to listen to what the guardian ad litem says.

[The guardian ad litem] has recommended based on his investigation, his discussion with the parties, based on him sitting through the testimony here that Mr. Helling be primary care provider and have primary placement of the child. That is a factor in the Court's decision. It's not the only factor.

Now, there are a lot of superficial reasons that are indicated here, and some of the reasons are well, Mr. Helling is a bad parent because he is taking his youngster around on the lawn mower, or Mr. Helling is a bad parent because he is giving his youngster a ride on the sidewalk on a motorcycle. You know, these are side issues. The real fundamental issue here is I have always said stability and predictability. And some of you have

810

practiced before me more than others, but fundamentally, I think it's the Court's obligation to figure out what the best parenting situation is that will give the youngster a place he can call home and to have that place be predictable and stable.

And what I try to sort out above all when I am making a decision in these cases is where that's going to occur. Now, the factor that I am talking about here, I think I have already addressed most of the factors under the custody proposal or custody criterion under 767.24(5). The factor that I practically harp on is the need for regularly occurring and meaningful periods of physical placement to provide predictability and stability for the child.

. . . One of the main factors here that concerns the Court probably the most and that is this, Ms. Lambert, you are not in a predictable and stable situation. That concerns me. You are not in a predictable and stable situation because, you know, you recently established a relationship with Mr. Weber.

[Material quoted at ¶ 11 of majority opinion.]

Now, Ms. Lambert, you are a good mom. There is no question about it, and it makes my decision a lot harder because while you have got that factor against you, you certainly are a good mom, and you have done a heck of a job raising this youngster, and that makes this decision harder.

On the other hand, Mr. Helling, you have done a pretty good job too, sir, and I think you have been a good father to this youngster. I think you have developed a good relationship with him, and I think you've demonstrated that if your cooking isn't all that great, at least it's improving. You are willing to learn, and that's the important thing, and the good things of life aside, the most important thing in any child's life is love and

811

affection for the child, parenting the child, creating a strong family ethic in the child, and I think that Mr. Helling, that benefit has to go to you.

You have a solid family background. I'm impressed by the care services that you are offering. I'm not denigrating Ms. Helling's care services, but the family loves—there is just no doubt in my mind the family loves that child, and the care provider, boy, they will do a heck of a job. But they are getting paid, and that's why they are there. And there is a lot of difference, and when I was watching [Helling's] sister up here, I was touched by the emotion that she showed when she was talking about how much she cared about that youngster and what she was prepared to do for that youngster.

I think the childcare situation definitely goes to Mr. Helling. Now, in short, when I look at the factors, and the rest of the factors really don't cut either way, there isn't any drug or alcohol problem. There isn't any abuse problem. They both are good people. I don't have any appropriate reports of professionals. There won't be any. There is no reason to. You folks are both well-adjusted people, and you are doing a good job with this child. He is doing well.

Now, [Lambert's counsel], the matter of inertia is a powerful argument in child custody matters. There is no question about that, and that is what the child is, well adjusted. It's Newton's first law of physics. Things that are at rest tend to remain at rest and things in motion tend to remain in motion. These things are at rest. Maybe Court should leave them at rest, but I think that the law of inertia, which is really what you are talking about, is not as big a factor as it normally would be in court decisions. Because while it's true mom has been the primary caretaker, we are talking about a child that's two and a half years old.

812

We are also talking about a child that's well adjusted to home changes. As you indicated, he had his home changed two or three times. He has had child care changes. He keeps right on going. He does well, and if this child were, you know, 13 or 14 and a hell raiser and gets along well with dad or mom and not the other side and that had been the arrangement, that's a different matter for the issue of inertia or continuation of an existing relationship.

But that's not so here. This child will do well. He can make adjustments, and so *if you had to capsulize my basis for my decision, I would say it's this. We got two good parents. We got two good situations as far as relationships with the youngster. The child is doing well, but I am concerned about predictability and stability in Ms. Lambert's relationship with Mr. Weber, and I don't think that's a predictable or stable situation. I'm also concerned about the type of care that Mr. Helling can give [through] his family and his family support system, which I think is a big factor in my decision.*

*And last, it's very hard for Court given the finding I have made to go against the recommendation of the guardian ad litem in this case who has done a very able and conscientious job in this matter.* I commend him for it. My judgment is going to be I will conclude that it's in the best interests of this child that the primary placement be with the petitioner David Helling.

(Emphasis added.)

¶ 27. Thus, when the remarks the majority finds objectionable are placed in the context of the court's entire ruling, it becomes apparent that the court's decision was *not* based "primarily . . . upon the trial court's negative view of [Lambert's] unmarried status." Majority at ¶ 17. Taken as a whole, the court's bench decision shows that it awarded Helling primary placement because of three factors: the greater "predict-

ability and stability" of his living situation, the proximity and availability to Helling of intra-family childcare providers, and the guardian ad litem's recommendation in favor of primary placement with Helling. I cannot conclude that any of these factors are inappropriate or that the trial court's reliance on them constituted an erroneous exercise of discretion.

¶ 28. Finally, I note that the majority believes that our decision in *Schwantes v. Schwantes*, 121 Wis. 2d 607, 360 N.W.2d 69 (Ct. App. 1984), compels a reversal here. It does not. The trial court in *Schwantes* conditioned its award of custody to the mother on her terminating a relationship with a third party, and when she failed to terminate the relationship, transferred custody of the children to the father. *Id.* at 619–21. Our holding was explicit and limited:

> We conclude that sec. 767.24(2), Stats., cannot be construed to confer upon the trial court the power to condition an award of custody on the termination of the custodial parent's relationship with another in the absence of a showing that the relationship has a significant adverse affect upon the children.

*Id.* at 625–26.

¶ 29. The trial court in this case did not condition Lambert's opportunity for physical placement of the child on her terminating her relationship with Mr. Weber. In fact, in addition to awarding the parties joint legal custody, the court gave Lambert placement of the child every week from 4:00 p.m. Thursday through 5:00 p.m. Friday, and on alternate weekends extending through Sunday evening at 7:00 p.m., plus two uninterrupted weeks in the summer and holidays as agreed upon by the parties. Nowhere does the court require or even suggest that Lambert could have these placement

periods only if she terminated her relationship with Weber or moved out of his residence. Neither did the court require that Weber not be present during Lambert's periods of placement.

¶ 30. In short, the trial court made no negative comments whatsoever about Lambert's relationship with Weber per se. It concluded only that Lambert's present living situation was not as predictable and stable as Helling's. Nothing in *Schwantes* prohibits the court from reaching this conclusion or from considering it as a factor in awarding primary placement.