IN RE the MARRIAGE OF:
Gerald SCHWANTES, Petitioner-Respondent,

v.

Charlotte SCHWANTES, Appellant.

Court of Appeals

*No. 82–2404. Submitted on briefs September 2, 1983.—*
*Decided November 27, 1984.*
(Also reported in 360 N.W.2d 69.)

608

For the appellant the cause was submitted on the briefs of *Linda S. Balisle* and *Koritzinsky, Neider, Langer & Roberson* of Madison.

For the petitioner-respondent the cause was submitted on the brief of *John H. Andrews* and *Consigny, Andrews, Hemming & Grant, S.C.* of Janesville.

Before Bablitch, J., Dykman, J. and Moser, J.

BABLITCH, J.   Charlotte Schwantes appeals from a judgment of divorce awarding custody of the parties' three minor children to her former husband Gerald Schwantes. The divorce itself was granted during a contested custody hearing on February 17, 1982. Following that hearing, the trial court issued a memorandum decision finding that both parties were fit parents and awarding custody to Charlotte, on the condition that she

terminate her relationship with one Trevor Busst. The precise terms of the property division and the amount of child support to be paid to Charlotte were deferred for voluntary resolution by the parties, or for a later hearing if no such resolution were possible.

More than six months after the custody hearing, the trial court ordered custody of the children transferred to Gerald on the sole ground that Charlotte was unable or unwilling to terminate her relationship with Trevor Busst. It made no finding that the transfer was necessary to the best interests of the children, as required by sec. 767.32(2), Stats. Although Charlotte was at that time unemployed, she was ordered to pay child support in the amount of $75 per week.

The issues are:

1. Whether the trial court abused its discretion by conditioning the initial award of custody to Charlotte on her termination of a personal relationship;

2. Whether the trial court abused its discretion by transferring custody from Charlotte to Gerald for violation of that condition without a finding, based upon substantial evidence, that the transfer was necessary to the best interests of the children;

3. Whether the trial court abused its discretion by ordering the mother to pay child support without ascertaining her ability to pay at the time the order was entered.

We conclude that the trial court abused its discretion with respect to each issue raised, and reverse.

The parties were married on May 31, 1968, and have three children. Their son David was nine at the time judgment was entered and their twin sons Luke and Mark were five. Gerald is an iron worker and Charlotte is a registered nurse. Gerald filed a petition for dissolution of marriage on July 30, 1980. The parties did not physically separate until several months later.

A stipulated temporary order was entered on February 17, 1981, awarding custody of the children to Charlotte, subject to reasonable visitation by the father. In June 1981 Gerald filed a motion to rescind the temporary order and transfer temporary custody to him, together with an affidavit alleging, among other things, that the children were being left too much with babysitters and that Trevor Busst, a man with whom Charlotte "is obviously having an intimate relationship," had been spending the night in the homestead for about two weeks while the children were present. Following an unrecorded hearing, the family court commissioner entered a second temporary order on August 4, 1981, finding both parties fit and proper persons for custody, awarding Gerald custody on alternate weekends and two week nights per week, and awarding custody to Charlotte at all other times "subject however, to the requirement that [she] not have any contact with adult male friends with the children present."

On September 4, 1981, Gerald again moved for a transfer of temporary custody, alleging that he had personally observed Trevor Busst at the home at a time when the children were present, in violation of the current order. Gerald also filed an affidavit signed by Charlotte's fifteen-year-old babysitter alleging that Trevor Busst had been in Charlotte's home at least three times during the month of August. The babysitter subsequently repudiated the affidavit in a notarized statement, and the motion was never brought to hearing.

In early November 1981 Gerald filed a motion for an order finding Charlotte in contempt of court for failing to make the children available to him during one of his scheduled weekend visitations. The evidence established that Charlotte had offered to trade weekends at least a week in advance, and had made the children available to Gerald's parents during her own weekend, but had taken the children to another city on the weekend in

question. The trial court found her guilty of contempt, sentenced her to ten days in jail, and allowed her to purge her contempt by payment of $70.00 in motion costs.

Custody, visitation, and child support were the only disputed issues during a two-day trial on February 17 and 18, 1982. Doctor Robert Gordon, a clinical psychologist who had tested and interviewed Gerald, Charlotte, each of the children, and Trevor Busst, was called as a witness for the guardian *ad litem*. Doctor Gordon's testimony amplified his previously submitted written report recommending that custody be awarded to Charlotte, as the better of the two parents.

Doctor Gorden testified that Charlotte was of normal intelligence, and had no significant problems which would interfere with her sound parenting and exercise of good judgment. Gerald, on the other hand, had an antisocial personality characterized by anger, rebellion, self-centered thinking, narcissism, impulsive behavior, poor judgment, and hostility which could erupt in emotional outbursts. He was also, said the doctor, an alcoholic who had not begun to take the first step toward recovery, the acceptance of his incurable, progressive, but arrestable disease. This diagnosis had been made ten years previously by doctors who had treated him for alcohol-related injuries, and was confirmed by high scores on two out of three alcohol scales during current psychological testing. The doctor testified that Gerald's claim that he had a drinking problem ten years ago, but now drank only about three beers a week, was not consistent with his test scores, his past history, or his then pending drunk driving charge. Gerald's problems, he said, were not so severe as to render him unfit to parent, but would render him less capable of providing the best care for the children.

Doctor Gordon testified that Trevor Busst was a somewhat unknown quantity because the test results, while

revealing no significant psychological disorders, indicated that he may have been attempting to minimize any problems and put himself in the best possible light. Trevor was articulate, dignified, "ostentatiously" accommodating, and "smooth" during the personal interview. The doctor could not determine whether any portion of this impression was due to Trevor's Australian upbringing. In making his recommendation that custody be awarded to Charlotte, the doctor took into consideration the fact that she and Trevor had an intimate relationship, which included sexual relations, during times when the children were present in the home.

According to Dr. Gordon, the three children were all operating within normal limits of intellectual functioning. None of them had personality disorders, although one of the twins, Mark, was perceived by a teacher as being very insecure and withdrawn. The eldest child, David, had expressed a preference to reside with his father, but the doctor believed that this preference was "superseded" by Gerald's personality problems.

Based upon Dr. Gordon's recommendation, and upon his separate investigation of the matter, the guardian *ad litem* filed a written report recommending that custody be awarded to Charlotte, subject to liberal visitation by Gerald, on the condition that Charlotte "does not cohabitate [sic] with a male not her lawful spouse or relative."

Gerald presented minimal evidence to support his assertion that he would make the better custodial parent,[1]

---

[1] Gerald testified he believed he would make a better custodial parent because of "the judgment she's [Charlotte] shown over the past year. In regards to her boyfriend, boarders at the house." [Charlotte's sister-in-law and three nephews and nieces were living with her temporarily at the time of the hearing.] He also testified he would "be interested enough to be there [with the children] most [of] the time." Gerald's aunt and the wife of one of Gerald's boyhood friends both testified to an opinion that he would make an "excellent parent."

or his criticisms of his wife's parenting abilities.[2] Other than his own denials, he presented no evidence to refute the testimony of Dr. Gordon and others that he was a chronic, practicing alcoholic who had taken no steps to address his illness. He admitted he had a drinking problem ten years earlier, when he consumed a case of beer and a quart of hard liquor a day. He claimed he had resolved this problem, however, and had been a "light to moderate" drinker for the past eight or nine years, consuming only about three beers per week. He admitted that he had a pending drunk driving charge and that he had taken the children to taverns during visitations on several occasions in the past year. He did not deny having stated during a temporary order hearing that if he had custody of the children he "wouldn't have to drink so much."

Gerald conceded that he had been away from the family for months at a time on several occasions during the marriage while working in Alaska and pursuing his education, but claimed he and Charlotte had contributed approximately equally to the child rearing functions because he had cared for the children when she worked a night nursing shift for a few months when the twins were infants. He admitted striking the children with a

---

[2] Gerald called one of Charlotte's neighbors, who disapproved of Trevor's presence at the home on moral grounds, and testified that she had heard Trevor discipline the children in a loud voice, or by yelling, on more than one occasion during the summer of 1981. Charlotte's aunt, who babysat for the children during the spring of 1981, testified she once heard Trevor give a verbal reprimand which "lasted too long." Gerald also called the ex-husband of one of Charlotte's sisters, who testified that he had once seen Charlotte smoke marijuana from a pipe with a group of people in the summer of 1975. The wife of a boyhood friend of Gerald testified that she felt Charlotte considered the children to be a "nuisance," and did not love them as much as Gerald, in part because Charlotte seemed upset to learn she was pregnant with her first child.

wooden board, but denied the punishment was excessive. He acknowledged that he had struck Charlotte once during a quarrel twelve years earlier, but denied her testimony concerning his physical abuse of her in recent years.

Gerald's chief witness at trial was Trevor Busst's former wife, Diane. She testified that she had married Trevor in 1974 and separated from him in January 1981 after obtaining counseling at a center for battered wives. She had sought the counseling after Trevor hit her thirteen-year old son from a former marriage with his open hand on the face and head. He had never hit the son before, she said, but he had hit or beaten her on some three dozen occasions during the marriage, bruising or otherwise injuring her some two dozen times. She said Trevor was charming, solicitous, and "perfect" before the marriage. Within two to three months after the wedding, however, he hit her so hard during an argument that he broke her nose. She decided to leave him and initiate a divorce, she said, because she feared her son would be less docile when he entered puberty than he had been before, and thus that he was likely to "cross" Trevor in the future, provoking further physical attacks.

Diane testified she did not believe the physical abuse she had experienced was the product of bad "chemistry" between her and Trevor, but was rather the product of his uncontrollable temper when under stress. She said she believed him when he told counselors they consulted together that he did not remember attacking her. She said that although the incidents of battery were not alcohol-induced, Trevor was unable to stop drinking once he started and that Dr. Gordon's testimony concerning the profile of an alcoholic fit Trevor. Trevor addressed that problem by not drinking, she said. He did not take drugs at home, but Diane believed he had used LSD,

marijuana, and "mushrooms" on occasion while out with friends. She said Trevor told her he had obtained a psychological discharge from the Australian army during the Viet Nam War by fooling the psychologist and psychological testers. She refused to say whether Trevor had attempted to influence her testimony or had threatened her if she testified, saying she was afraid to answer the question. She said: "Trevor's a very good person, too, your honor. If—if somehow he could get rid of the bad side, he's a very, very good person."

The trial court admonished the guardian *ad litem* for failing to depose Diane Busst prior to trial and refused to allow him to cross-examine her regarding her 1972 custody battle with her former husband.[3]

Trevor Busst was not called to give evidence. On the second day of trial, following Diane Busst's testimony, Charlotte testified that she had terminated her relationship with Trevor on the preceding night. She said she had been shocked by Diane's testimony and did not want to subject herself or her children to the possibility of similar treatment. She testified she had never observed any conduct in Trevor of the sort described by Diane. He had never struck her, and had disciplined the children only twice that she knew of at her request. She also testified that since the amended temporary order entered August 4, 1981, she had not had contact with Trevor while the children were present. Up to that time, she said, he and her children had a very positive relationship, and enjoyed a variety of activities together. In response to a question from the guardian *ad litem,* Charlotte affirmed that she could abide by a court order conditioning her custody of the children on an absolute termination of the relationship with Trevor.

---

[3] The attempted cross-examination was based upon the facts recited in an Indiana court of appeals decision affirming an award of custody of Diane Busst's child to her former husband. *Shaw v. Shaw,* 304 N.E.2d 536 (Ind. Ct. App. 1973).

Charlotte acknowledged that in the spring and summer of 1981, after she and Trevor began going together, she was frequently away from home in the evenings and was not paying enough attention to the children. Since then, however, she had spent all but two evenings with them.

Charlotte testified that Gerald's daily, heavy use of alcohol continued throughout the marriage and that he drank to intoxication on many occasions. When he returned home in the evenings after drinking, he would either ignore her and the children or "holler" at them. His conduct got "really bad" before the final separation, she said. Many times, his drinking companions would carry him into the house and drop him on the bed. Sometimes he would vomit on her, on the floor, in the bed. Sometimes he would urinate in a shoe, on the carpeting, out a window, or outdoors. One time he ended up sleeping in a fetal position in a playpen. He would not remember these incidents on the next day.

Charlotte testified that Gerald beat her on several occasions, sometimes in front of the children. He also demeaned and criticized her in their presence, and in the presence of other members of her family. At family gatherings he would encourage others to drink, and belittle them if they did not. She described his role with the children as that of a disciplinarian. He never played with them, she said, and used a "big stick" to punish them. Gerald's frequent long absences from the family in Alaska and at school were not motivated by a desire for financial improvement, she said, but because he had difficulty relating to her and had to get away. He left for Alaska immediately after the twins were born, having declared in the delivery room that they were not his children. Although he took care of all three boys while she worked a nighttime nursing shift, he insisted that she return to a day schedule because he could not "hack" caring for the twins. During the past school year, she

said, he rarely took the twins for his midweek visitation, and took the older boy only every other week. One of the twins, Mark, became upset and tearful before each weekend visitation, and had to be held and reassured that he was coming home after the visit.

Both Charlotte's sister Joan, who had lived with Charlotte and Gerald for two and one-half years in 1975 through 1977, and her sister-in-law Evelyn, who had lived there for three or four months in 1977 and 1978, corroborated Charlotte's testimony concerning Gerald's daily use of alcohol, his frequent intoxication, his demeaning remarks to Charlotte, and his harsh discipline of the children. Both confirmed that Charlotte was heavily involved in the children's school and extra-curricular activities, and that Gerald was not. Both said Charlotte did most of the housework without Gerald's assistance. Joan testified that she had heard Gerald deny his paternity of the children, had see him beat Charlotte, and had observed a positive relationship between the children and Trevor.

Joan, Evelyn, and Charlotte's psychotherapist, Janis Hansen, testified that Charlotte had a warm, loving, solid relationship with the children and was a very good parent who spent much time in that role. Mrs. Hansen, who had also counseled with the children, testified that she was aware of Charlotte's relationship with Trevor and saw no evidence that it had had an adverse effect on the children, who seemed to get along quite well with him. She also testified that Charlotte's commencement of a relationship with another man during the divorce was a part of her coming to terms with the end of her marriage and building a new life of her own. She believed that Trevor had helped Charlotte a lot in that process.

Doctor Gordon was recalled. Hypothetical questions were posed to him which communicated the essence of Diane Busst's testimony regarding Trevor's treatment

of her and her child during their marriage. "Assuming the truth of this information," he said, his recommendation that custody be awarded to Charlotte would "definitely change" if Charlotte continued the relationship with Trevor. He was not asked, and did not state, what his recommendation would be if the relationship did not end. No hypotheticals were posed to him with respect to the testimony concerning Gerald's conduct towards his family during the marriage. He modified his custody recommendation to condition it on Charlotte's absolute termination of any relationship with Trevor. He said that Trevor and Gerald were "very similar in their makeup."

The trial court's memorandum decision, issued on March 17, 1981, found that both Charlotte and Gerald were fit parents. It expressly found the testimony of Charlotte's sister and sister-in-law to be credible with respect to Gerald's continuing heavy alcohol consumption, and his practice of ignoring the children and satisfying his own needs. It also found that Charlotte had been unaware of Trevor's violent nature, and that while she had not spent sufficient time with the children during the early days of her relationship with him, she had "cleaned up her act" after the August 4, 1981, modified temporary order was entered. It also found that Charlotte was sincere in her intention to terminate the relationship with Trevor "at all costs." It said that it was "satisfied that the best interests of the children would be served by awarding custody to Mrs. Schwantes provided that there is a complete, total separation of exposure to Trevor Busst by Mrs. Schwantes and of the children." No formal findings of fact, conclusions of law, or judgment were entered at that time.

At a hearing on August 30, 1982, the parties' counsel informed the court that a buyer had been found for the homestead, and requested that the remaining issues of division of property, support, and visitation be resolved.

Counsel also related that Charlotte had agreed to stipulate that custody of the children be transferred to Gerald and asked the court for an order to that effect. The court approved the transfer "with the proviso that there is an accord on the part of the guardian *ad litem,* and the court finds no reason later not to approve that." The guardian *ad litem* consented to the transfer, representing that he had been informed Charlotte was in violation of the conditions of the custody award to her, or that she desired not to be bound by them. No evidence was taken at the hearing. The court stated that it wanted the reasons for the transfer to be of record, either by written stipulation or by testimony.

An evidentiary hearing was held on September 10, 1982. The guardian *ad litem* was not present. Charlotte testified that she had quit her nursing job in the beginning of July, and had transferred custody of the children to Gerald on August 13. She said both decisions were based on her emotional instability arising out of Gerald's continuing harassment with respect to custody and visitation of the children, and stress resulting from her inability to terminate her relationship with Trevor as required by the court.

Charlotte testified that she had begun seeing Trevor again in the spring, but had never done so while the children were present, and that Trevor had not had contact with them for more than a year. She said she loved him, no longer believed his former wife's testimony about him, and believed he would be a good influence on the children. She said she had given custody to Gerald and went to stay at Trevor's apartment when Gerald told her he would continue fighting in court for custody "every chance I get for the rest of the children's growing up years." She said she had thought that if Gerald had custody perhaps "he won't be so upset with me, and then the kids won't be told that their mother's no good . . . ." She said she was not satisfied that custody was

with Gerald and had made her decision "under much stress."

The trial court stated that it could make orders to alleviate harassment, if that were the basis for her decision, but that it would not reconsider its earlier order conditioning custody on termination of the relationship with Trevor. It said Charlotte had "a clear-cut choice; you terminate your relationship with Trevor Busst and you keep your kids, or you continue your relationship with Travor Busst and you don't keep your kids." The court indicated it still considered Trevor to be "an extremely dangerous person" and said:

This court has no right in any way to tell you whom you can associate with; that is your choice, but I can and I do make the determination your association with Trevor Busst and you having the children are not in their best interests. Now, is that your choice, to have the custody transferred to your former husband because you cannot disassociate yourself with Trevor Busst?

After being prompted by her attorney to answer the court's question, which was finally read back by the court reporter, Charlotte responded "Yes."

No evidence was adduced as to Gerald's present circumstances except that he was not presently working and was drawing unemployment compensation because of a lack of work in the area.

The trial court approved the transfer of custody to Gerald and ordered Charlotte to pay $75 per week as child support on grounds that nursing work was available and that she was capable of obtaining employment when she chose to do so. After additional argument, it granted Charlotte's request, over Gerald's objection, that Charlotte's visitation could be exercised with Trevor, provided that it not take place in his home and that Charlotte was present at all times. The final judgment, from which this appeal is taken, provided that Charlotte "is not to exercise her visitation with the children by

exposing them at any time to a live-in arrangement beween herself and a man or by allowing the children to be in the presence of Trevor Busst without [Charlotte's] being personally present at all times."

### Conditional Award of Custody

Charlotte contends on appeal that the trial court has no power to impose as a condition of custody the termination or prohibition of the custodial parent's personal relationships.

Section 767.24(2), Stats., provides that the court must consider a number of factors in making a custody determination, including:

(b) The interaction and interrelationship *of the child with* his or her parent or parents, siblings, and *any other person who may significantly affect the child's best interest.* [Emphasis supplied.]

There is no provision in ch. 767, Stats., entitling the court to consider the relationship between a parent and other persons in fashioning a custody determination.

Although the trial court has a broad discretion with respect to custody determinations, which will be given great weight on review, *Allen v. Allen,* 78 Wis. 2d 263, 271, 254 N.W.2d 244, 249 (1977), " '[c]ourts have no power in awarding custody of minor children other than that provided by statute.' " *In re Marriage of Groh v. Groh,* 110 Wis. 2d 117, 123, 327 N.W.2d 655, 658 (1983) (quoting with approval *Hamachek v. Hamachek,* 270 Wis. 194, 198, 70 N.W.2d 595, 597 (1955)). An abuse of discretion occurs when the court applies an erroneous rule of law. *In re Marriage of Gould v. Gould,* 116 Wis. 2d 493, 498, 342 N.W.2d 426, 429 (1984). "[W]here the legislature has set forth a plan or scheme as to the manner and limitation of the court's exercise

of its jurisdiction, that expression of the legislative will must be carried out and power limitations adhered to." *Groh,* 110 Wis. 2d at 123, 327 N.W.2d at 658.

In *Groh* the supreme court held that the trial court had no power to condition the mother's retention of custody upon her moving to live within a fifty-mile radius of the city in which the father resided. The court noted that sec. 767.245(1), Stats. (1979–80), guaranteed a noncustodial parent reasonable visitation rights, and that the statute required the custodial parent to obtain permission before removing the child to a residence outside the state. 110 Wis. 2d at 124–25, 327 N.W.2d at 659. The court reasoned that the legislature's failure to confer on trial courts the corresponding power to limit a custodial parent's movement within the state evinced a "legislative intent not to permit the exercise of [such] power." (Footnote omitted.) 110 Wis. 2d at 125, 327 N.W.2d at 659. *Groh* rejected the proposition that the trial court was entitled to impose any conditions on custody it believed to be in the best interests of the child because in that event "the limits the legislature placed on the court's exercise of power in custody matters would be meaningless." 110 Wis. 2d at 126, 327 N.W.2d at 659. The court concluded that the order requiring the mother to either move from Rhinelander to Milwaukee or forfeit custody of the children was "a nullity." *Id.*

Charlotte contends the *Groh* analysis compels the conclusion that the trial court had no authority to condition the award of custody to her on the termination of her relationship with Trevor because it is limited to considering those factors specified for custody determinations in sec. 767.24(2), Stats., and the relationship between a parent to a third person is not such a factor. Gerald counters that sec. 767.24(2)(f) broadly authorizes the trial court to consider "[s]uch other factors as the court may in each individual case determine to be

relevant," and contends that the trial court properly considered Trevor as "a person who would obviously interact and interrelate with the children and 'who may significantly affect the child's best interest' " within the meaning of sec. 767.24 (2) (b).

The difficulty with Gerald's contention is that the trial court made no finding that Charlotte's relationship with Trevor, as distinct from a relationship between Trevor and the children, would have any relevance to the children's best interest under sec. 767.24 (2) (f), Stats., much less a significant effect on such interests as specified in sec. 767.24 (2) (b). The record is undisputed that Trevor had no contact with the children between late August 1981 and the custody hearing in mid-February 1982, despite his continuing relationship with Charlotte. Although Charlotte initially testified that she intended to continue the relationship, there is no indication in the record that she intended to involve the children in the relationship if custody were awarded to her.

Doctor Gordon testified that Charlotte was uncertain as to the long-term nature of her association with Trevor, that she was concerned that any man assuming a stepparent role be good for the children, and that she considered Trevor to be only a *"potential candidate"* for that role. Charlotte's counselor testified that Trevor's character did not play an important role in her assessment of Charlotte's parenting abilities because there was no guarantee that a dating relationship during the divorce process would materialize into a permanent relationship in the future. Charlotte testified that her initial intention to continue the relationship did not encompass the intention of marrying Trevor, but was based upon their enjoyment of each other's company. At the time the trial court imposed the condition that the relationship be severed, there was no record basis to conclude that its continuation would have an adverse effect, or any effect at all, on the children.

This court is required to construe statutes so as to render them constitutional, wherever possible. *State ex rel. Ft. Howard Paper Co. v. Lake Dist. Bd.,* 82 Wis.2d 491, 505, 263 N.W.2d 178, 185 (1978). Freedom of association is protected by the first amendment to the federal constitution. A parent's interest "in the companionship, care, custody, and management of his or her children" is also a basic civil right. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972). The government may not require individuals to choose between two constitutional rights. *Aptheker v. Secretary of State,* 378 U.S. 500, 507 (1964). While some infringements of associational freedoms have been upheld where reasonably related to a legitimate state interest,[4] we can conceive of no valid interest which would be served by requiring a parent to terminate a personal relationship, as a condition of custody, without some showing that the relationship has an adverse effect on the children. *See In re Marriage of Wellman,* 164 Cal. Rptr. 148, 152–53 (Cal. Ct. App. 1980) (award of custody on condition that custodial parent have no overnight visitation with a member of the opposite sex in presence of children, unless married to said individual, unduly restrictive of privacy and associational interests in absence of compelling evidence that such conduct has significant bearing on welfare of children).

We conclude that sec. 767.24(2), Stats., cannot be construed to confer upon the trial court the power to

[4] *See Edwards v. State,* 74 Wis. 2d 79, 84–85, 246 N.W.2d 109, 111–12 (1976) (order forbidding contact with co-defendants, as condition of probation, upheld as reasonably related to rehabilitative purposes of probation). *See also United States v. Lawson,* 670 F.2d 923 (10th Cir. 982) (condition of probation, construed as limited to prohibiting defendant's association with organizations advocating disobedience to tax laws, upheld); *Birzon v. King,* 469 F.2d 1241 (2nd Cir. 1972) (parole condition that parolee not associate with persons having criminal record or engaged in criminal activity, upheld).

condition an award of custody on the termination of the custodial parent's relationship with another in the absence of a showing that the relationship has a significant adverse effect upon the children. No such effect may be implied from the fact that the relationship in question is sexually intimate. *See In re Marriage of Gould v. Gould,* 116 Wis. 2d 493, 502–03, 342 N.W.2d 426, 431–32 (1984) (speculative harm to children from custodial mother's nontraditional lifestyle and extramarital relationship was insufficient to warrant transfer of custody absent a stated "connection" between the relationship or mother's "moral-social values" and some present demonstrative harm to child's best interests) ; *Wendland v. Wendland,* 29 Wis. 2d 145, 154, 138 N.W.2d 185, 189–90 (1965) (nonmarital sexual conduct does not affect the fitness of a parent to have custody in absence of adverse consequences to children).

Because the record does not demonstrate an adverse effect on the children arising out of Charlotte's continuing relationship with Trevor, the trial court had no authority to condition the custody award on her termination of that relationship. Since it had no power to order the condition, the condition is "a nullity." *Groh,* 110 Wis.2d at 126, 327 N.W.2d at 659.

### Transfer of Custody

The sole reasons cited by the trial court for transferring custody from Charlotte to Gerald were Charlotte's inability to abide by the termination condition which we have determined to be invalid, and the choice Charlotte was forced to make to exchange her continued custody of the children for a renewed relationship with Trevor. We reject Gerald's characterization of this choice as "voluntary," and his implication that by making

it Charlotte waived her right to attack the transfer of custody on this appeal.

Waiver is the "voluntary and intentional relinquishment of a known right." *Bank of Sun Prairie v. Opstein,* 86 Wis. 2d 669, 681, 273 N.W.2d 279, 284 (1979). Charlotte did not know she had a right to refuse to abide by the condition imposed by the trial court. Her acquiescence in the transfer of custody was based upon the presumption that the condition was valid. Such an acquiescence cannot be viewed as either voluntary or intentional, and did not constitute a waiver.

Section 767.32(2), Stats., provides in material part:

Whenever the welfare of any such child will be promoted thereby, the court granting such judgment shall always have the power to change the care and custody of any such child, either by giving it to or taking it from any parent, relative or agency. . . . Any modification of a custody order which removes a child from the care of a parent having custody of the child *shall be based on a finding that such removal is necessary to the child's best interest as shown by substantial evidence supporting a change in custody under s. 767.24(2).* [Emphasis supplied.]

No evidence was adduced at the August 30, 1982 hearing when the custody transfer was initially approved. No evidence concerning the current circumstances of the children was presented at the September 10, 1982 hearing in which the transfer to Gerald was confirmed. The only evidence adduced as to the current circumstances of either parent was that each was unemployed, and that Charlotte had been staying in Trevor's apartment for about three weeks. The parties, the trial court, and the guardian *ad litem,* who was not even present at the September hearing, all proceeded as though the only material question were Charlotte's willingness to abide

by the earlier conditional custody award, and as though a transfer to Gerald automatically followed the violation of that condition. We conclude that the trial court abused its discretion by ordering the custody transfer without finding, based on substantial evidence, that the transfer was necessary for the best interests of the children as required by sec. 767.32(2), Stats.

Charlotte contends, and we agree, that a conditional custody award which purports to make a transfer of custody automatic upon violation of the condition is both contrary to sec. 767.32(2), Stats., and contrary to public policy. In *In re Marriage of Millikin v. Millikin,* 115 Wis. 2d 16, 23, 339 N.W.2d 573, 576 (1983), the supreme court said that the language of the statute "reflects the legislature's intent to *forbid* custody modification absent 'substantial evidence supporting a change of custody' showing 'such removal is necessary to the child's best interest.'" (Emphasis added.) The supreme court continued:

Of course, in deciding whether a change of custody is necessary, the court will review all relevant factors as listed in sec. 767.24(2). *However, we emphasize that in reviewing the sec. 767.24(2) factors the court's focus must be on the necessity for removal.*

Although we cannot define with precision the word "necessary" for purposes of a change in custody determination, we note that the "necessary" standard has a higher threshold than a simple showing of "best interest," but a lower threshold than "essential." Thus, for example, "necessary" does not mean that the child need be in impending or immediate danger of life, health, or safety. *Rather, we view "necessary" as implying that the change of custody itself is needed because the current custodial conditions are harmful in some way to the best interest of the child.* Such harm should not be found, however, simply because the custodial parent cannot match the better general living conditions offered by the parent seeking change of custody. In order for better

living conditions to become significant, they must rectify a condition in the current custodial arrangement that is harmful to the child's best interest. [Emphasis supplied.]

115 Wis. 2d at 23–4, 339 N.W.2d at 576.

Although *Millikin* recognized that the trial court could "limit the evidence adduced at a hearing when the original custody award was made after a litigated hearing," and need not relitigate "previously established matters," 115 Wis. 2d at 24, 339 N.W.2d at 576, the thrust of the supreme court's language, like that of the statute, goes to the circumstances of the parties and the children at the time a transfer is sought. The question is whether present harm in the custodial setting necessitates a transfer in the children's best interests. More recently, the supreme court has said:

Where the circuit court finds, as it did here, that the custodial parent is loving, concerned, and fit, and there is no circuit court finding that the "current custodial conditions are harmful in some way to the best interest of the child," *Millikin, supra,* 115 Wis. 2d at 23, a modification of the custody order is an abuse of discretion.

*Gould,* 116 Wis. 2d at 505, 342 N.W.2d at 433.

A provision allowing automatic transfer for violation of a conditional custody award fixes the focus of inquiry on circumstances existing at the time of the initial award, rather than on present harm necessitating a transfer. This does not comport with the statutory mandate, as construed by the supreme court. The dangers of such a provision, if automatically enforced, are readily apparent from the facts of this case. The transfer was made in a vacuum of current information respecting the welfare of the children. It was undisputed that Trevor had not seen them in more than a year, and thus that Charlotte had successfully insulated the children from any possible harm from his supposedly violent nature. The possibility

of such harm was the sole reason given by the trial court for imposing the condition terminating the relationship on the initial award of custody. Current harm to children from violation of a condition cannot logically be inferred where its absence is undisputed. Without a showing based on substantial evidence that "current custodial conditions are harmful in some way to the best interest of the child," it is not possible to find that removal is necessary to the child's best interest as required by sec. 767.32(2), Stats. *Gould,* 116 Wis. 2d at 505, 342 N.W.2d at 433 (quoting *Millikin,* 115 Wis. 2d at 23–4, 339 N.W.2d at 576).

The effect of the transfer was to remove custody from a parent whom the trial court had found to be fit, loving, and concerned, and in whose custody the children had prospered according to the last record evidence, and to place it with a parent whose ability to parent at a comparable level was cast in serious doubt by that same record. The trial court neither had nor sought current information with respect to Gerald's use of alcohol, methods of discipline, or other "red flag" areas of concern discussed at the original custody hearing. Even if removal from Charlotte's custody had been shown to be "necessary" within the meaning of the statute, no evidence supported a determination that the best interests of the children would be served by placing custody with Gerald.

We conclude that the trial court abused its discretion by transferring custody without a showing, based upon substantial evidence, that the current custodial circumstances necessitated the transfer under sec. 767.32(2), Stats. The judgment must therefore be reversed.

### Child Support

An award of child support is committed to the sound discretion of the trial court, and will not be reversed

except for an abuse of discretion. *Edwards v. Edwards,* 97 Wis. 2d 111, 116, 293 N.W.2d 160, 163 (1980). A proper exercise of discretion rests upon consideration of the needs of the custodial parent and the ability of the noncustodial parent to pay. *Id.* Ability to pay is a factor of income, assets, debts, health, age, and other such circumstances at the time the award is made. *Anderson v. Anderson,* 72 Wis. 2d 631, 643, 242 N.W.2d 165, 171 (1976).

Although Gerald presented a budget of his current needs, no corresponding financial information was obtained from Charlotte. It is undisputed that she left her employment more than two months before the hearing because she felt emotionally unstable and unable to perform her work adequately. She testified that she wished to return to work as soon as she felt capable of doing so. The record is silent as to when that might be. Although the court was informed at an earlier hearing that the parties anticipated receiving a net of $45,000 from the sale of the homestead, out of which fees for both attorneys and the guardian *ad litem* were to be paid, the record is silent as to what either party actually received if the sale was consummated.

The court made no finding concerning Charlotte's ability to pay child support. There is nothing of record from which that ability could be ascertained. There is no support for the trial court's finding that nursing work was readily available to Charlotte when she chose to resume it, or from which to conclude that Charlotte was well enough to return to work at that time or in the near future. Discretion must be exercised by a process of reasoning from the facts of record. *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20 (1981). Because this process is not demonstrated on the record before us, the trial court abused its discretion in ordering Charlotte to pay child support of $75 per week.

*By the Court.*—Judgment reversed.