STATE of Wisconsin, Plaintiff-Respondent,†

v.

George A. FAUCHER, Defendant-Appellant.

Court of Appeals

*No. 97–2702–CR. Submitted on briefs May 20, 1998.—Decided June 24, 1998.*

(Also reported in 584 N.W.2d 157.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Suzanne Hagopian*, assistant state public defender, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Warren D. Weinstein*, assistant attorney general.

Before Brown, Nettesheim and Anderson, JJ.

BROWN, J. A juror informed the trial court during trial that he knew the State's key witness and that he considered her to be a person of integrity who "wouldn't lie." Because there were no alternate jurors, the defendant, George A. Faucher, moved for a mistrial. The trial court determined that a mistrial was unwarranted because the juror had subsequently assured the court that he could lay aside any personal feelings and render a verdict based on the evidence presented in court. Rather than have the juror continue to sit on the jury, Faucher offered to continue with only eleven jurors, which suggestion the court accepted. We hold that Faucher's willingness to go with eleven jurors did not waive his right to further address the mistrial ruling. We further hold that because the totality of the juror's responses revealed bias so manifest that his assurances of impartiality were insufficient to preclude prejudice, a mistrial should have been ordered. We reverse and remand for a new trial.

In 1996, Faucher was employed in a nursing home as a certified nursing assistant. Faucher was fired on March 21, 1996, after another nursing assistant, Paulette Hayes, claimed that three weeks earlier she had witnessed Faucher fondling the breast of one of the nursing home residents. The State subsequently charged Faucher with second-degree sexual assault in violation of § 940.225(2)(g), STATS., 1993–94.

A trial followed and a panel of twelve jurors was selected. There were no alternate jurors. Because Hayes was the only witness to the alleged assault, the trial was essentially a credibility contest between Hayes and Faucher. Hayes testified during the morning of the second day of trial, and after her testimony the court recessed for lunch. After lunch, the trial court

691

informed the parties that one of the jurors had informed the bailiff during lunch that he recognized one of the witnesses. The court then brought the juror into the courtroom and conducted an individual voir dire. After the juror informed the court that he knew Hayes, the court engaged in a colloquy with the juror. The court's colloquy with the juror is the focal point of this case, so we quote it at length:

> COURT: Okay. And tell me, in general, the nature of that acquaintanceship.
>
> JUROR: [Hayes] was our next-door neighbor, and I knew the family very well—well, relatively, so I knew who she—I knew of her, and not only knew of her, *and she was a girl of integrity* . . . .
>
> COURT: She was your next-door neighbor?
>
> . . . .
>
> JUROR: Yes.
>
> COURT: When was that?
>
> JUROR: That was from 19—last four years.
>
> COURT: Is she still your next-door neighbor?
>
> JUROR: Off and on. Her parents live next-door. And so she's always over there visiting and stuff. We always go by and say hi and that kind of stuff.
>
> COURT: You don't socialize with her personally?
>
> JUROR: No, I do not.
>
> COURT: With that relationship, that acquaintanceship, could you judge her testimony the same as you judge the testimony of any other witness, giving her testimony no more or less credit just because of that relationship?

JUROR: *I know she's a person of integrity, and I know she wouldn't lie.*

. . . .

COURT: Well, okay. . . . Could you put any feelings that you have aside and decide—weigh her testimony the same as you weigh the testimony of any other witness—

JUROR: Yes.

COURT: —called to testify at this trial, instructed to by the Court?

JUROR: Yes. [Emphases added.]

Apparently because Hayes had recently married, the juror had not recognized her name when the prosecutor read its list of witnesses before trial. The prosecutor then questioned the juror, and the juror again stated that he could put aside his feelings and judge the credibility of the witness based solely on the evidence presented in court. However, in response to defense counsel's questions, the juror again indicated that, based on his personal relationship with Hayes and his experiences with her as a next-door neighbor, he believed she "wouldn't lie." The court once more asked the juror if he could put aside his personal feelings and not give Hayes' testimony "any more or less credit just because of that relationship . . . ." The juror again assured the court that he could.

The defense then moved the court to strike the juror from the jury because he expressed bias. Also, because no alternate jurors were available, the defense moved for a mistrial, stating that "I don't want to go with 11 [jurors]." The trial court stated that although it did not "profess to be happy about this state of affairs," it was not going to grant a mistrial. The trial court

believed that a mistrial was unwarranted because the juror had testified under oath that he "could put aside any feelings that he may have and judge the credibility of all the witnesses based upon the criteria that the Court will give him." The defense then informed the court that because the mistrial motion was being denied, it was willing to proceed with eleven jurors. The prosecutor balked at this idea.

The trial court then brought the juror back into the courtroom and asked him if he had disclosed his relationship with Hayes to any other juror. The juror said that he had informed all of the jurors that he knew one of the witnesses and that the witness was his neighbor. However, he did not tell the other jurors which witness this was.[1] Nor did he share with them his opinion about Hayes' credibility. The defense again objected to the juror continuing to serve on the jury. The trial court, however, refused to alter its initial ruling.

In the end, the prosecutor agreed to proceed with eleven jurors. The trial court then engaged Faucher in a colloquy to satisfy itself that Faucher was freely and voluntarily waiving his right to a twelve-person jury. The court then excused the juror and the trial proceeded with the remaining eleven. The eleven jurors returned a guilty verdict.

Faucher subsequently filed a postconviction motion alleging that the trial court violated his constitutional and statutory rights by refusing to strike the juror for cause and order a mistrial. The motion also claimed that the error was not cured by Faucher's agreement to proceed with a jury of eleven after the

---

[1] The prosecution had called six other witnesses to the stand to testify about, among other things, the circumstances under which Hayes reported the sexual assault. None of these witnesses had observed Faucher engage in the alleged conduct.

court denied the mistrial motion. Following a hearing, the court concluded that it did not err by refusing to grant a mistrial. Also, it ruled that because the motion for a mistrial was properly denied, Faucher's decision to waive his right to a twelve-person jury was voluntary. Additionally, the court found that Faucher's waiver would be voluntary even if a mistrial should have been granted. It opined that the decision to deny the motion to strike the juror and order a mistrial was not "the controlling factor" in Faucher's decision to proceed with an eleven-person jury. Faucher appeals.

The right to a trial by an impartial, "indifferent" jury is guaranteed both by Article I, Section 7 of the Wisconsin Constitution[2] and the Sixth Amendment of the United States Constitution,[3] as well as principles of due process. *See State v. Louis*, 156 Wis. 2d 470, 478, 457 N.W.2d 484, 487 (1990). In *Louis*, our supreme court set forth the law with respect to claims of juror bias:

> Prospective jurors are presumed impartial, and the challenger to that presumption bears the burden of proving bias. Bias may be either implied as a matter of law or actual in fact. Even the appearance of bias should be avoided. The question of whether a prospective juror is biased and should be dismissed from the jury panel for cause is a matter of the circuit court's discretion. The circuit court must be satisfied that it is more probable than not that the

[2] "[I]n prosecutions by indictment, or information [the accused shall enjoy the right] to a speedy public trial by an impartial jury . . . ." WIS. CONST. art I, § 7.

[3] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. CONST. amend. VI

> juror was biased. A determination by the circuit court that a prospective juror can be impartial should be overturned only where bias is "manifest."

*Id.* at 478–79, 457 N.W.2d at 487–88 (citations omitted). An erroneous exercise of discretion will be found only if the trial court's discretionary decision is based on an error of law. *See State v. Gesch,* 167 Wis. 2d 660, 666, 482 N.W.2d 99, 102 (1992).

Faucher concedes that a juror's personal knowledge of or acquaintance with a witness, without more, is insufficient to establish bias as a matter of law. Nonetheless, he asserts that in this case the juror's bias is manifest given his opinion, based on his personal relationship with Hayes, that she was a person of integrity who would not lie. The State, however, contends that because the juror testified under oath that he could set aside his personal opinions and decide the case solely on the evidence presented at trial, the record fails to establish "manifest" bias.

The supreme court's opinion in *Gesch* provides us with a useful analytical building block for this case. There, a potential juror informed the court during jury selection that one of the State's main witnesses (a policeman) was his brother. *See id.* at 663, 482 N.W.2d at 100. The juror indicated that he saw his brother every month and that they were on good terms. *See id.* at 664, 482 N.W.2d at 101. He also stated that he would not feel uncomfortable if other jurors criticized his brother's testimony during deliberations. *See id.* Because the juror assured the court that he would remain impartial and give no additional weight to his brother's testimony, the trial court refused to dismiss the juror. *See id.*

The supreme court reversed, holding that "where a prospective juror is related to a state witness by blood

696

or marriage to the third degree, special problems exist that render a circuit court's search for actual bias an inadequate protection of a defendant's right to an impartial jury. One such problem is the potential for unconscious bias." *See id.* at 667, 482 N.W.2d at 102. The court did not question the juror's statement that he could remain impartial. However, it determined that although no actual bias may exist, the risk of unconscious bias was manifest because "[i]t is virtually impossible for a prospective juror to consciously estimate how the family relationship with a witness will affect his or her judgment." *Id.* And it was utterly impossible for any court to determine how far the judgment or action of a person affected by the family relationship may be swayed or controlled. *See id.* The mere probability of bias was so high, therefore, that in order to assure the defendant the fundamental fairness to which he was entitled, bias was implied and the juror should have been excluded as a matter of law. *See id.* at 668, 482 N.W.2d at 102.

Applying the *Gesch* rationale to the case at bar, we conclude that under the circumstances the juror's bias was such as to warrant his exclusion as a matter of law. We note that no case law or statute defines "bias" or what constitutes "manifest bias." However, bias is commonly defined to mean a prepossession of some point of view such that the mind does not respond impartially to anything related to this point of view. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 211 (1993). It implies that the juror is unable to function as a neutral, or indifferent, weigher of evidence presented at trial. "Manifest bias" is therefore bias that is readily perceived, or evident, from the record. *See id.* at 1375

("manifest" defined to mean readily perceived by the senses; evident).

Here, Hayes had been the juror's next-door neighbor for four years and her parents still lived next door. Although she no longer lived with her parents, she was "always over there" and the juror would "always go by and say hi and that kind of stuff." They might not have socialized together, but it is apparent that the juror had a good relationship with Hayes and her parents and that he interacted with them on a regular basis. More importantly, the record is abundantly clear that the juror's relationship and familiarity with Hayes were such that he had developed deeply-rooted opinions about her character. The juror repeated his assessment, even after assuring the court and the prosecutor that he could decide the case based solely upon the evidence, that he not only knew Hayes but, based on his observations, believed her to be "*a person of integrity . . . [who] wouldn't lie.*" Thus, the juror's own statements manifest bias—his credibility assessment had been preordained as a result of the out-of-court relationship with Hayes—thereby raising serious doubts about his ability to render a verdict based solely on the evidence presented at trial. We have no doubt that the juror honestly believed that he could place his feelings aside and remain impartial. But the trial was a credibility contest between Hayes and Faucher—the sole witness and the alleged perpetrator of the crime. And, similar to *Gesch*, given the strength of the juror's opinion about Hayes' credibility it is utterly impossible for any court to determine with confidence that his judgment or action would not be swayed or controlled by his preconceived convictions. We can only conclude that his good faith statements to remain impartial are

insufficient to obviate prejudice from his exposure to information outside the courtroom.

The State argues that *Gesch* is inapposite for two reasons. First, it claims that the rationale in *Gesch* is limited only to cases of juror bias due to a close blood relationship. But this is too narrow an interpretation of *Gesch*. *Gesch* illustrates those circumstances in which juror bias requires the court to exclude the juror even though there are assurances of impartiality. In *Gesch*, the law presumed that because of a family relationship the juror would have already developed deep-seated opinions about the character and integrity of the family member and that he would be unable to lay those opinions aside during trial. Thus, because it was impossible to look into the juror's mind to evaluate the impact of any preconceived opinions upon his actions at trial, the probability of bias was so high as to warrant exclusion as a matter of law. *See Gesch*, 167 Wis. 2d at 668, 482 N.W.2d at 102.

The rationale outlined in *Gesch* for excluding the juror as a matter of law is clearly applicable to the case before us. In fact, this case is stronger than the facts in *Gesch*. There the juror assured the court, as in this case, that he could remain impartial. But the supreme court relied upon the family relationship to "infer" that the juror had developed strongly held opinions about his brother's character and credibility. The court then held that bias was implied and the juror was excluded as a matter of law. Here, the evidence of bias is manifest in the record; we need not infer it. In *direct response* to the court's question of whether he could give Hayes' testimony no more or less credit because of their relationship, the juror unequivocally announced his belief that Hayes is "*a person of integrity . . . [who] wouldn't lie.*" The juror had already made an assess-

ment of the key State witness' credibility before that witness ever stepped foot in the courtroom. He had formed this opinion based on his extensive contact with her outside the courtroom. His bias was voiced and is evident in the record. And, as in *Gesch*, the juror's bias is such that his good faith assurances of impartiality are inadequate to obviate prejudice from his exposure to information outside the courtroom.

The State also argues that the court's opinion in *Gesch* was motivated chiefly by its concern that having a close blood relative on the jury would have a chilling effect upon other jurors who might hesitate to criticize the witness' testimony in front of a family member. Thus, concludes the State, because the juror is not related to Hayes and because he did not disclose his relationship with Hayes or his opinion about her to the other jurors, the concerns underlying the *Gesch* case simply do not exist.

But we have already set forth our understanding of the rationale underpinning the *Gesch* decision. We see no reason to revise it in light of the State's argument. Furthermore, although we are not confronted with the risk of a family member's presence chilling the jury's deliberation, the risk of having the juror sit on the jury is substantial nonetheless. The case was a credibility dispute between Hayes and Faucher, and the jury would have to eventually choose who was the more credible person. If the juror were allowed to deliberate with the other jurors, he would have brought all of his experiences and convictions about Hayes' credibility with him to the table. The danger is just too great that the juror would have emphatically announced his views about Hayes' credibility if another juror questioned her honesty. Although we acknowledge that we do not know for sure what would have occurred, we

conclude that, especially in a criminal case, the defendant should not be made to bear this risk. *See id.* We accordingly reject the State's arguments that *Gesch* is inapposite to the case at bar.

The State also argues that the outcome of this case is controlled by *State v. King*, 120 Wis. 2d 285, 354 N.W.2d 742 (Ct. App. 1984). We disagree. Although that case is similar in that a juror discovered that he knew one of the State's witnesses (the victim) during the course of a criminal trial, it is readily distinguishable from the case before us. Unlike the juror in this case, the juror in *King* had only a superficial relationship with the witness—they had been coworkers in a factory at one time and the juror testified that the witness was simply someone he recognized and with whom he had exchanged greetings in the workplace. *See id.* at 295, 354 N.W.2d at 747. Furthermore, the juror in *King* apparently had no preconceived opinions about the witness' credibility or character. The witness was simply someone he recognized from work. Therefore, because the juror informed the court during voir dire that he could remain impartial, the trial court did not err when it denied the defense motion to exclude the juror. *See id.* at 29–6, 354 N.W.2d at 747. We have already explained how, under the circumstances of this case, the juror's assurances of impartiality do not obviate prejudice. The State's reliance on *King* is therefore misplaced.[4]

---

[4] Also, the State cites a host of cases from other jurisdictions which it contends support its position that the juror's assurances of impartiality defeat any claim of bias. But these cases are all similar in that they involve jurors who were not dismissed even though they admitted to having general preconceived notions about the credibility of certain types of witnesses. *See Brown v. State*, 490 S.E.2d 75 (Ga. 1997) (witness

We therefore conclude that because the juror in this case was biased as a matter of law, the court erroneously exercised its discretion by not excluding him from the jury. Furthermore, we conclude that Faucher's offer to continue the case with eleven jurors does not operate to prevent him from raising the issue on appeal.[5] The decision to relinquish a right has to be voluntary and intentional. *See Schwantes v. Schwantes,* 121 Wis. 2d 607, 627, 360 N.W.2d 69, 78 (Ct. App. 1984). It must be the product of free will, untainted by coercion. Here, the trial court's ruling effectively left Faucher with a Hobson's choice. He either had to continue the trial with the biased juror sitting in the jury box deciding his fate or he had to offer to continue with less than his constitutionally

believed testimony of police officers more credible than other types of witnesses); *Kerns v. State,* 920 P.2d 632 (Wyo. 1996) (juror doubted credibility of drug dealers); *Reaves v. State,* 586 N.E.2d 847 (Ind. 1992) (juror believed police officers were more credible than other witnesses); and *State v. Bastida,* 310 So. 2d 629 (La. 1975) (juror believed drug addicts were less truthful than nonaddicts).

In each case, the court held that there was no misuse of discretion because of the juror's assurances that he or she could keep an open mind and weigh the evidence fairly. None of these cases address the situation before us—where the juror has a personal relationship with the witness and has formed convictions about the witness' credibility based on that relationship—and therefore they provide no support for the State's position.

[5] The State concedes that we need not address the issue of whether Faucher voluntarily waived his right to a twelve-person jury if we determine that the court erred when it denied Faucher's motion to exclude the juror and order a mistrial. But we choose to address it.

prescribed complement of twelve jurors. The Hobson's choice was really no choice at all. We reverse the judgment and order that the case be remanded for a new trial.[6]

---

[6] Two days after we released this opinion the supreme court decided *State v. Ferron*, 219 Wis. 2d 481, 579 N.W.2d 654 (1998), setting forth a two-factor test, set forth in the disjunctive, that an appellate court should employ when determining whether a prospective juror's bias is "manifest." The court announced:

> [W]e hold that a prospective juror's bias is "manifest" whenever a review of the record: (1) does not support a finding that the prospective juror is a reasonable person who is sincerely willing to put aside an opinion or prior knowledge; or (2) does not support a finding that a reasonable person in the juror's position could set aside the opinion or prior knowledge.
>
> Adopting this approach serves two purposes. With a focus on prospective jurors' subjective willingness to set aside their biases, the first prong of this approach accounts for the circuit court's superior position to assess the demeanor and disposition of prospective jurors. The second prong allows the appellate courts to determine whether under the particular circumstances surrounding the voir dire examination, no reasonable juror could put aside the bias or opinion which is revealed by the record. *See, e.g., Gesch*, 167 Wis. 2d at 667, 482 N.W.2d 99 (concluding that prospective jurors who are related to a state witness by blood or marriage to the third degree must be struck from the jury panel on the basis of implied bias).

*Ferron*, 219 Wis. 2d at 498–99, 579 N.W.2d at 661.

We are satisfied that after applying the two-factor test announced in *Ferron*, neither the reasoning we employed nor the result we reached changes in any way. As we implied in the body of our opinion, the juror in this case was a reasonable person who said he was sincerely willing to put aside an opinion or prior knowledge of the State's key witness. Thus, the first prong of the *Ferron* test augers in favor of the State. But, as to the second factor, we remain convinced that the record would not support a finding that a reasonable person in the juror's position could actually set aside his opinion as to the witness's

*By the Court.*—Judgment and order reversed and cause remanded.

credibility. Therefore, using the *Ferron* test, our decision stands as is.